## A.Z. *vs.* B.Z.

Suffolk. November 4, 1999. - March 31, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*In Vitro Fertilization. Husband and Wife,* Agreement concerning disposition of frozen preembryos. *Contract,* Agreement concerning disposition of frozen preembryos. *Public Policy.*

This court noted the academic commentary, the legislation enacted in three States, and the two decisions of State courts of last resort, concerning the disposition of frozen preembryos. [155-157]

This court concluded that the terms of an agreement between a married couple and an in vitro fertilization clinic regarding the disposition of their frozen preembryos, and the circumstances in connection with the couple's execution of related consent forms, did not clearly represent the intentions of the parties some four years later in the context of their divorce, and was not enforceable. [157-159]

This court stated that, as a matter of public policy, it would not enforce an agreement regarding the disposition of frozen preembryos that would compel one of the donors to become a parent against his or her will. [159-162]

CIVIL ACTION commenced in the Suffolk Division of the Probate and Family Court Department on July 31, 1995.

The case was heard by *Anthony R. Nesi,* J., on a request for a permanent restraining order.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Gretchen Van Ness* for the mother.

The following submitted briefs for amici curiae:

*Luke Stanton* for Catholic Medical Association & others.

*Dwight G. Duncan* for Massachusetts Citizens for Life, Inc.

COWIN, J. We transferred this case to this court on our own motion to consider for the first time the effect of a consent form between a married couple and an in vitro fertilization (IVF)

clinic (clinic) concerning disposition of frozen preembryos.[1] B.Z., the former wife (wife) of A.Z. (husband), appeals from a judgment of the Probate and Family Court that included, inter alia,[2] a permanent injunction in favor of the husband, prohibiting the wife from "utilizing" the frozen preembryos held in cryopreservation[3] at the clinic. The probate judge bifurcated the issue concerning the disposition of the frozen preembryos from the then-pending divorce action.[4] The wife appeals only from the issuance of the permanent injunction.[5] On February 8, 2000, we issued an order affirming the judgment of the Probate and Family Court. The order stated: "It is ordered that the permanent injunction entered on the docket on March 25, 1996 in Suffolk County Probate Court (Docket No. 95 D 1683 DV) be, and the same hereby is, affirmed. Opinion or opinions to follow." This opinion states the reasons for that order.

1. *Factual background.* We recite the relevant background facts as determined by the probate judge in his detailed findings of fact after a hearing concerning disposition of the preembryos at which both the husband and wife were separately represented by counsel. The probate judge's findings are supplemented by the record where necessary.

a. *History of the couple.* The husband and wife were married in 1977. For the first two years of their marriage they resided in

---

[1]We use the term "preembryo" to refer to the four-to-eight cell stage of a developing fertilized egg. See 62 Ethics Committee of the American Fertility Society, Ethical Considerations of Assisted Reproductive Technologies, Fertility and Sterility at 29S-30S (Supp. 1 Nov. 1994) (explaining terminology and transformation of single cell into multicellular newborn).

[2]The issue arose in the context of a divorce proceeding.

[3]Cryopreservation is the "[m]aintenance of the viability of excised tissues or organs at extremely low temperatures." Stedman's Medical Dictionary 375 (25th ed. 1990).

[4]The husband and wife separated in August, 1995, and later that month the husband filed for divorce. In September, 1995, the husband filed a motion for an ex parte temporary restraining order regarding a vial of frozen preembryos stored at the IVF clinic. The judge did not act on the motion, but ordered a hearing at which counsel for both the husband and the wife stipulated to a "standstill order." The judge then bifurcated the issue presented here from the pending divorce action, but stated that the disposition of the issue concerning the frozen preembryos would be a final determination incorporated into the final divorce judgment. The probate judge's order granting the husband a permanent injunction in this case was subsequently incorporated in the final divorce decree.

[5]Although he participated in the probate proceedings, the husband did not appear or file a brief in this court.

Virginia, where they both served in the armed forces. While in Virginia, they encountered their first difficulties conceiving a child and underwent fertility testing. During their stay in Virginia the wife did become pregnant, but she suffered an ectopic pregnancy,[6] as a result of which she miscarried and her left fallopian tube was removed.

In 1980, the husband and wife moved to Maryland where they underwent additional fertility treatment. The treatment lasted one year and did not result in a pregnancy. In 1988, the wife was transferred to Massachusetts and the husband remained in Maryland to continue his schooling. After arriving in Massachusetts, the wife began IVF treatments at an IVF clinic here. At first the husband traveled from Maryland to participate in the treatments. In 1991, he moved to Massachusetts.

Given their medical history, the husband and wife were eligible for two types of fertility procedures: Gamete Inter-Fallopian Transfer (GIFT) and IVF. IVF involves injecting the woman with fertility drugs in order to stimulate production of eggs which can be surgically retrieved or harvested. After the eggs are removed, they are combined in a petri dish with sperm produced by the man, on the same day as the egg removal, in an effort to fertilize the eggs. If fertilization between any of the eggs and sperm occurs, preembryos are formed that are held in a petri dish for one or two days until a decision can be made as to which preembryos will be used immediately and which will be frozen and stored by the clinic for later use. Preembryos that are to be utilized immediately are not frozen.

GIFT involves the removal of eggs from the woman that are then transferred simultaneously with the sperm into the fallopian tube where fertilization occurs before the embryo implants in the uterus. The husband and wife initially chose the GIFT procedure because it has a higher success rate than IVF. The GIFT procedure was performed on November 6, 1988. Another ectopic pregnancy resulted and the wife's remaining fallopian tube was removed. Left with no alternatives, the husband and wife turned to the IVF procedure.

They underwent IVF treatment from 1988 through 1991. As a result of the 1991 treatment, the wife conceived and gave birth

---

[6]An ectopic pregnancy is one that occurs outside the uterus, the normal locus of pregnancy. Stedman's Medical Dictionary 488 (25th ed. 1990). In this case, the pregnancy occurred in and ruptured the fallopian tube, requiring surgery to remove it.

to twin daughters in 1992. During the 1991 IVF treatment, more preembryos were formed than were necessary for immediate implantation, and two vials of preembryos were frozen for possible future implantation.

In the spring of 1995, before the couple separated, the wife desired more children and had one of the remaining vials of preembryos thawed and one preembryo was implanted. She did so without informing her husband.[7] The husband learned of this when he received a notice from his insurance company regarding the procedure. During this period relations between the husband and wife deteriorated. The wife sought and received a protective order against the husband under G. L. c. 209A. Ultimately, they separated and the husband filed for divorce.

At the time of the divorce, one vial containing four frozen preembryos remained in storage at the clinic. Using one or more of these preembryos, it is possible that the wife could conceive; the likelihood of conception depends, inter alia, on the condition of the preembryos, which cannot be ascertained until the preembryos are thawed. The husband filed a motion to obtain a permanent injunction, prohibiting the wife from "using" the remaining vial of frozen preembryos.

b. *The IVF clinic and the consent forms.* In order to participate in fertility treatment, including GIFT and IVF, the clinic required egg and sperm donors (donors) to sign certain consent forms for the relevant procedures. Each time before removal of the eggs from the wife, the clinic required the husband and wife in this case to sign a preprinted consent form concerning ultimate disposition of the frozen preembryos. The wife signed a number of forms on which the husband's signature was not required. The only forms that both the husband and the wife were required to sign were those entitled "Consent Form for Freezing (Cyropreservation) of Embryos" (consent form), one of which is the form at issue here.[8]

Each consent form explains the general nature of the IVF

---

[7]No pregnancy resulted. One vial of frozen preembryos remains stored at the clinic. A whole vial must be thawed at one time; single preembryos cannot be removed from the vial and thawed individually.

[8]The clinic required that a consent form be completed each time before the egg retrievals, regardless of whether any preembryos were ultimately produced and frozen. Once preembryos are produced and frozen, a new consent form does not need to be filled out by the husband and wife to authorize a thawing and transfer of frozen preembryos, unless they change their prior choices.

procedure and outlines the freezing process, including the financial cost and the potential benefits and risks of that process. The consent form also requires the donors to decide the disposition of the frozen preembryos on certain listed contingencies: "wife or donor" reaching normal menopause or age forty-five years; preembryos no longer being healthy; "one of us dying"; "[s]hould we become separated"; "[s]hould we both die." Under each contingency the consent form provides the following as options for disposition of the preembryos: "donated or destroyed — choose one or both." A blank line beneath these choices permits the donors to write in additional alternatives not listed as options on the form, and the form notifies the donors that they may do so.[9] The consent form also informs the donors that they may change their minds as to any disposition, provided that both donors convey that fact in writing to the clinic.

The probate judge noted that the clinic's current GIFT and IVF handbook, which was in evidence, states that the consent forms were "good for one year." There was no evidence whether this one-year limitation was in effect between 1988 and 1991. If a one-year limitation existed at that time, there was no evidence whether the husband and wife were aware of it. We do not attach significance to the provision in the handbook.

c. *The execution of the forms.* Every time before eggs were retrieved from the wife and combined with sperm from the husband, they each signed a consent form.[10] The husband was present when the first form was completed by the wife in October, 1988. They both signed that consent form after it was finished. The form, as filled out by the wife, stated, inter alia, that if they "[s]hould become separated, [they] both agree[d] to have the embryo(s) . . . return[ed] to [the] wife for implant." The husband and wife thereafter underwent six additional egg retrievals for freezing and signed six additional consent forms, one each in June, 1989, and February, 1989, two forms in December, 1989, and one each in August, 1990, and August, 1991. The August, 1991, consent form governs the vial of frozen preembryos now stored at the clinic.

Each time after signing the first consent form in October,

---

[9]On one occasion, the wife called the clinic to inquire about the form and was advised that "she could cross out any of the language on the form and fill in her own [language] to fit her wishes."

[10]The husband and wife signed a total of seven consent forms. All the forms were preprinted and identical to the consent form described above.

1988, the husband always signed a blank consent form. Sometimes a consent form was signed by the husband while he and his wife were traveling to the IVF clinic; other forms were signed before the two went to the IVF clinic. Each time, after the husband signed the form, the wife filled in the disposition and other information, and then signed the form herself. All the words she wrote in the later forms were substantially similar to the words she inserted in the first October, 1988, form. In each instance the wife specified in the option for "[s]hould we become separated," that the preembryos were to be returned to the wife for implantation.

2. *The Probate Court's decision.* The probate judge concluded that, while donors are generally free to agree as to the ultimate disposition of frozen preembryos, the agreement at issue was unenforceable because of a "change in circumstances" occurring during the four years after the husband and wife signed the last, and governing, consent form in 1991:[11] the birth of the twins as a result of the IVF procedure, the wife's obtaining a protective order against the husband, the husband's filing for a divorce, and the wife's then seeking "to thaw the preembryos for implantation in the hopes of having additional children." The probate judge concluded that "[n]o agreement should be enforced in equity when intervening events have changed the circumstances such that the agreement which was originally signed did not contemplate the actual situation now facing the parties." In the absence of a binding agreement, the judge determined that the "best solution" was to balance the wife's interest in procreation against the husband's interest in avoiding procreation. Based on his findings,[12] the judge determined that the husband's interest in avoiding procreation outweighed the wife's interest in having additional children and granted the permanent injunction in favor of the husband.

3. *Legal background.* While IVF has been available for over two decades and has been the focus of much academic com-

---

[11]There was considerable delay between the entry of judgment in the Probate Court on May 14, 1996, and the argument on the present appeal. The delay was due to the fact that portions of the record were missing and had to be reconstructed.

[12]In view of our disposition, it is unnecessary to summarize these findings.

mentary,[13] there is little law on the enforceability of agreements concerning the disposition of frozen preembryos. Only three States have enacted legislation addressing the issue. See Fla. Stat. Ann. § 742.17 (West 1997) (requiring couples to execute written agreement for disposition in event of death, divorce or other unforeseen circumstances); N.H. Rev. Stat. Ann. §§ 168-B:13 to 168-B:15, 168-B:18 (1994 & Supp. 1999) (requiring couples to undergo medical examinations and counseling and imposing a fourteen-day limit for maintenance of ex utero prezygotes[14] ); La. Rev. Stat. Ann. §§ 9:121-9:133 (1991) (providing that "prezygote considered 'juridical person' that must be implanted[,]" *Kass* v. *Kass*, 91 N.Y.2d 554, 563 [1998]).

Two State courts of last resort, the Supreme Court of Tennessee and the Court of Appeals of New York, have dealt with the enforceability of agreements between donors regarding the disposition of preembryos and have concluded that such agreements should ordinarily be enforced. The Supreme Court of Tennessee, in *Davis* v. *Davis*, 842 S.W.2d 588 (Tenn. 1992), cert. denied sub nom. *Stowe* v. *Davis*, 507 U.S. 911 (1993), considered the issue in a dispute between a husband and his former wife after the two were divorced. The wife sought to donate the preembryos at issue to another couple for implantation.[15] The court stated that agreements between donors regarding disposition of the preembryos "should be presumed valid

---

[13]See, e.g., Coleman, Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes, 84 Minn. L. Rev. 55 (1999); Note, To Have or Not to Have: Whose Procreative Rights Prevail in Disputes Over Dispositions of Frozen Embryos?, 27 Conn. L. Rev. 1377 (1995); Forster, The Legal and Ethical Debate Surrounding the Storage and Destruction of Frozen Human Embryos: A Reaction to the Mass Disposal in Britain and the Lack of Law in the United States, 76 Wash. U. L.Q. 759 (1998); Robertson, Prior Agreements for Disposition of Frozen Embryos, 51 Ohio St. L.J. 407 (1990); Sheinbach, Examining Disputes Over Ownership Rights to Frozen Embryos: Will Prior Consent Documents Survive if Challenged by State Law and/or Constitutional Principles?, 48 Cath. U. L. Rev. 989 (1999); Note, Divergent Conceptions: Procreational Rights and Disputes Over the Fate of Frozen Embryos, 7 B.U. Pub. Int. L.J. 315 (1998); Walter, His, Hers, or Theirs — Custody, Control, and Contracts: Allocating Decisional Authority Over Frozen Embryos, 29 Seton Hall L. Rev. 937 (1999).

[14]Ex utero prezygotes are fertilized eggs being stored outside the body.

[15]When the suit commenced, the wife had sought custody of the preembryos for herself for implantation. By the time the case reached the Supreme Court of Tennessee, the wife had changed her position. *Davis* v. *Davis*, 842 S.W.2d 588, 589 (Tenn. 1992), cert. denied sub nom. *Stowe* v. *Davis*, 507 U.S. 911 (1993).

and should be enforced."[16] *Id.* at 597. In that case, because there was no agreement between the donors regarding disposition of the preembryos, the court balanced the equitable interests of the two parties and concluded that the husband's interest in avoiding parenthood outweighed the wife's interest in donating the preembryos to another couple for implantation. *Id.* at 603.

The Court of Appeals of New York, in *Kass* v. *Kass, supra,* agreed with the Tennessee court's view that courts should enforce agreements where potential parents provide for the disposition of frozen preembryos.[17] *Id.* at 565. The issue arose in that case also in the context of a dispute between a husband and his former wife after divorce. The wife sought custody of the preembryos for implantation. According to the New York court, agreements "should generally be presumed valid and binding, and enforced in any dispute between [the donors]."[18] *Id.,* citing *Davis* v. *Davis, supra* at 597. While recognizing that it is difficult for donors to anticipate the future of their relationship, the court concluded that such agreements minimize misunderstanding, maximize procreative liberty, and provide needed certainty to IVF programs. *Kass* v. *Kass, supra.* The court determined that the consent form signed by the donors with the IVF clinic unequivocally manifested the donors' mutual intent, and that this intent was further highlighted by the divorce instrument, which was consistent with the consent form and had been signed only months before suit was begun. *Id.* at 567. Therefore the court enforced the agreement that provided that the frozen preembryos be donated to the IVF clinic. *Id.* at 567-569.[19]

4. *Legal analysis.* This is the first reported case involving the disposition of frozen preembryos in which a consent form signed between the donors on the one hand and the clinic on the other

[16]The Supreme Court of Tennessee used the term "embryo" to describe the fertilized egg. *Id.* We use the term "preembryo" throughout for consistency.

[17]The Court of Appeals of New York used the term "pre-zygotes" to refer to the fertilized egg. *Kass* v. *Kass,* 91 N.Y.2d 554, 557 n.1 (1998). We continue to use the term "preembryo" for consistency.

[18]The consent form signed by the donors in the *Kass* case provided that the preembryos should be disposed of by donating them to scientific research. *Id.* at 560. The court did not address a circumstance in which the form stated that the preembryos be given to one of the donors for implantation in the donor.

[19]While we discuss the holdings in the *Davis* and *Kass* cases, we do not necessarily subscribe to the views expressed in those decisions. See notes 22 and 23, *infra.*

provided that, on the donors' separation, the preembryos were to be given to one of the donors for implantation. In view of the purpose of the form (drafted by and to give assistance to the clinic) and the circumstances of execution, we are dubious at best that it represents the intent of the husband and the wife regarding disposition of the preembryos in the case of a dispute between them. In any event, for several independent reasons, we conclude that the form should not be enforced in the circumstances of this case.

First, the consent form's primary purpose is to explain to the donors the benefits and risks of freezing, and to record the donors' desires for disposition of the frozen preembryos at the time the form is executed in order to provide the clinic with guidance if the donors (as a unit) no longer wish to use the frozen preembryos. The form does not state, and the record does not indicate, that the husband and wife intended the consent form to act as a binding agreement between them should they later disagree as to the disposition. Rather, it appears that it was intended only to define the donors' relationship as a unit with the clinic.

Second, the consent form does not contain a duration provision.[20] The wife sought to enforce this particular form four years after it was signed by the husband in significantly changed circumstances and over the husband's objection. In the absence of any evidence that the donors agreed on the time period during which the consent form was to govern their conduct, we cannot assume that the donors intended the consent form to govern the disposition of the frozen preembryos four years after it was executed, especially in light of the fundamental change in their relationship (i.e., divorce).

Third, the form uses the term "[s]hould we become separated" in referring to the disposition of the frozen preembryos without defining "become separated." Because this dispute arose in the context of a divorce, we cannot conclude that the consent form was intended to govern in these circumstances. Separation and divorce have distinct legal meanings.[21] Legal changes occur by operation of law when a couple divorces that

[20]See *supra* at 154-155.

[21]See, e.g., G. L. c. 191, § 9 (revocation of dispositions in will to former spouse upon divorce or annulment; decree of separation does not terminate status of husband and wife and is not divorce for purposes of statute); *Du-Mont* v. *Godbey*, 382 Mass. 234, 236 (1981) ("Divorce, but not separation,

do not occur when a couple separates. Because divorce legally ends a couple's marriage, we shall not assume, in the absence of any evidence to the contrary, that an agreement on this issue providing for separation was meant to govern in the event of a divorce.

The donors' conduct in connection with the execution of the consent forms also creates doubt whether the consent form at issue here represents the clear intentions of both donors. The probate judge found that, prior to the signing of the first consent form, the wife called the IVF clinic to inquire about the section of the form regarding disposition "upon separation": that section of the preprinted form that asked the donors to specify either "donated" or "destroyed" or "both." A clinic representative told her that "she could cross out any of the language on the form and fill in her own [language] to fit her wishes." Further, although the wife used language in each subsequent form similar to the language used in the first form that she and her husband signed together, the consent form at issue here was signed in blank by the husband, before the wife filled in the language indicating that she would use the preembryos for implantation on separation. We therefore cannot conclude that the consent form represents the true intention of the husband for the disposition of the preembryos.

Finally, the consent form is not a separation agreement that is binding on the couple in a divorce proceeding pursuant to G. L. c. 208, § 34. The consent form does not contain provisions for custody, support, and maintenance, in the event that the wife conceives and gives birth to a child. See G. L. c. 208, § 1A; C.P. Kindregan, Jr. & M.L. Inker, Family Law and Practice § 50.3 (2d ed. 1996). In summary, the consent form is legally insufficient in several important respects and does not approach the minimum level of completeness needed to denominate it as an enforceable contract in a dispute between the husband and the wife.

With this said, we conclude that, even had the husband and

revokes will provisions for the former spouse . . ."); *Campagna* v. *Campagna*, 337 Mass. 599, 605 (1958) (decree of living apart for justifiable cause does not sever marital relationship and therefore does not change status of property held by tenancy by entirety); *Bernatavicius* v. *Bernatavicius*, 259 Mass. 486, 489 (1927) ("A tenancy by the entirety . . . cannot continue after the tenants have become divorced and thus have ended the legal relationship to each other, which constitutes the essence of that tenancy").

the wife entered into an unambiguous agreement between themselves regarding the disposition of the frozen preembryos, we would not enforce an agreement that would compel one donor to become a parent against his or her will.[22] As a matter of public policy, we conclude that forced procreation is not an area amenable to judicial enforcement. It is well established that courts will not enforce contracts that violate public policy.[23] *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 320-321 (1996). *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 543 (1974). *Exxon Corp.* v. *Esso Workers' Union, Inc.*, 118 F.3d 841, 844-845 (1st Cir. 1997). While courts are hesitant to invalidate contracts on these public policy grounds, the public interest in freedom of contract is sometimes outweighed by other public policy considerations; in those cases the contract will not be enforced.[24] *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.*, *supra*. To determine public policy, we

---

[22]That is the relief sought by the wife in this case. We express no view regarding whether an unambiguous agreement between two donors concerning the disposition of frozen preembryos could be enforced over the contemporaneous objection of one of the donors, when such agreement contemplated destruction or donation of the preembryos either for research or implantation in a surrogate.

We also recognize that agreements among donors and IVF clinics are essential to clinic operations. There is no impediment to the enforcement of such contracts by the clinics or by the donors against the clinics, consistent with the principles of this opinion.

[23]The New York court noted that the wife had not argued that the consent form violated public policy, and suggested that in some circumstances agreements may be unenforceable for that reason. *Kass* v. *Kass*, 91 N.Y.2d 554, 565 n.4 (1998).

[24]We have refused to enforce contracts in a variety of contexts because of a conflict with public policy. See, e.g., *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 322-325 (1996) (contract in which neighborhood association promised not to oppose beer and wine license in exchange for promise of restaurant not to seek general alcohol license violates public policy); *Loranger Constr. Co.* v. *C. Franklin Corp.*, 355 Mass. 727, 730 (1969) (covenant restraining trade violates public policy if not limited reasonably in time and space); *DiLeo* v. *Denault*, 329 Mass. 590, 595-596 (1953) (contract requiring proprietor of union barber shop to join barbers' union violates public policy); *Allen* v. *Lawrence*, 318 Mass. 210, 213 (1945) (contract in which public official agrees to accept lower salary than established by law violates public policy); *New Haven Road Constr. Co.* v. *Long*, 269 Mass. 16, 18 (1929) (contract requiring payment to private contractor for use of public highway violates public policy); *Parsons* v. *Trask*, 7 Gray 473, 478 (1856) (contract establishing unlimited period of servitude violates public policy).

look to the expressions of the Legislature and to those of this court. *Capazzoli* v. *Holzwasser*, 397 Mass. 158, 160 (1986).

The Legislature has already determined by statute that individuals should not be bound by certain agreements binding them to enter or not enter into familial relationships. In G. L. c. 207, § 47A, the Legislature abolished the cause of action for the breach of a promise to marry. In G. L. c. 210, § 2, the Legislature provided that no mother may agree to surrender her child "sooner than the fourth calendar day after the date of birth of the child to be adopted" regardless of any prior agreement.

Similarly, this court has expressed its hesitancy to become involved in intimate questions inherent in the marriage relationship. *Doe* v. *Doe*, 365 Mass. 556, 563 (1974). "Except in cases involving divorce or separation, our law has not in general undertaken to resolve the many delicate questions inherent in the marriage relationship. We would not order either a husband or a wife to do what is necessary to conceive a child or to prevent conception, any more than we would order either party to do what is necessary to make the other happy." *Id.*

In our decisions, we have also indicated a reluctance to enforce prior agreements that bind individuals to future family relationships.[25] In *R.R.* v. *M.H.*, 426 Mass. 501 (1998), we held that a surrogacy agreement in which the surrogate mother agreed to give up the child on its birth is unenforceable unless the agreement contained, inter alia, a "reasonable" waiting period during which the mother could change her mind. *Id.* at 510. In *Capazzoli* v. *Holzwasser, supra*, we determined, as an expression of public policy, that a contract requiring an individual to abandon a marriage is unenforceable. And, in the same spirit, we stated in *Gleason* v. *Mann*, 312 Mass. 420, 425 (1942), that agreements providing for a general restraint against marriage are unenforceable.

---

[25]We have enforced agreements regarding the family relationship once the parties have freely entered into that relationship, but these cases have not involved the issue of procreation. See G. L. c. 209, § 2 (married woman may make contracts with husband); *Ames* v. *Perry*, 406 Mass. 236, 241 (1989), quoting *White* v. *White*, 141 Vt. 499, 503 (1982) (providing that "divorcing parents may in some cases bind themselves in contract on matters involving their children"); *Stansel* v. *Stansel*, 385 Mass. 510 (1982) (enforcing separation agreement); *Rosenberg* v. *Lipnick*, 377 Mass. 666, 673 (1979) (enforcing antenuptial agreement). Cf. *Wilcox* v. *Trautz*, 427 Mass. 326, 327 (1998) (enforcing agreement between unmarried cohabitants).

We glean from these statutes and judicial decisions that prior agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions. This enhances the "freedom of personal choice in matters of marriage and family life." *Moore* v. *East Cleveland*, 431 U.S. 494, 499 (1977), quoting *Cleveland Bd. of Educ.* v. *LaFleur*, 414 U.S. 632, 639-640 (1974).

We derive from existing State laws and judicial precedent a public policy in this Commonwealth that individuals shall not be compelled to enter into intimate family relationships, and that the law shall not be used as a mechanism for forcing such relationships when they are not desired. This policy is grounded in the notion that respect for liberty and privacy requires that individuals be accorded the freedom to decide whether to enter into a family relationship. See *Commonwealth* v. *Stowell*, 389 Mass. 171, 173 (1983). "There are 'personal rights of such delicate and intimate character that direct enforcement of them by any process of the court should never be attempted.' " *Doe* v. *Doe, supra* at 559, quoting *Kenyon* v. *Chicopee*, 320 Mass. 528, 534 (1946).

In this case, we are asked to decide whether the law of the Commonwealth may compel an individual to become a parent over his or her contemporaneous objection. The husband signed this consent form in 1991. Enforcing the form against him would require him to become a parent over his present objection to such an undertaking. We decline to do so.