[No. C055516. Third Dist. Sept. 11, 2008.]

Estate of JOSEPH M. KIEVERNAGEL, Deceased.
IRIS KIEVERNAGEL, Petitioner and Appellant, v.
PATSY KIEVERNAGEL et al., Objectors and Respondents.

**COUNSEL**

Friedberg & Parker, Edward Freidberg and Suzanne M. Alves for Petitioner and Appellant.

Jay-Allen Eisen, C. Athena Roussos; Childers & Murray and John M. Murray for Objectors and Respondents.

**OPINION**

**MORRISON, J.**—In this case we must decide whether a widow has the right to use her late husband's frozen sperm to attempt to conceive a child where her late husband signed an agreement with the company storing the frozen sperm providing that the frozen sperm was to be discarded upon his death. We conclude that in determining the disposition of gametic material, to which no other party has contributed and thus another party's right to procreational autonomy is not implicated, the intent of the donor must control. In this judgment roll appeal, the widow cannot challenge the probate court's finding that the decedent's intent was to have his frozen sperm discarded upon his death. Accordingly, we affirm the decision denying distribution of the frozen sperm to the widow.

## FACTUAL AND PROCEDURAL BACKGROUND

Joseph and Iris Kievernagel were married for 10 years prior to Joseph's death. They contracted with the Northern California Fertility Medical Center, Inc., to perform in vitro fertilization (IVF) to allow Iris to conceive. The fertility center operated a sperm cryopreservation storage program under which sperm was collected and stored at temperatures as low as -196 degrees centigrade. The frozen sperm could then be thawed and used for insemination. The center required Joseph to store a sperm sample under this program in case his live sperm could not be used on the day of insemination.

As part of the sperm cryopreservation storage program, the center required an IVF backup sperm storage and consent agreement (the Agreement). Iris completed the Agreement and Joseph signed it. The Agreement provided that the sperm sample was Joseph's sole and separate property and he retained all authority to control its disposition. The Agreement provided for two options for the disposition of the sperm sample upon death or incapacitation: donate the sperm to his wife or discard the sperm sample. The box indicating the sperm sample was to be discarded was checked and Joseph initialed it. The Agreement also provided the sperm sample was to be discarded upon divorce. Iris signed, acknowledging the sperm sample was Joseph's sole and separate property.

Joseph died in a helicopter crash in July 2005.

Iris was appointed administrator of Joseph's estate. She petitioned under Probate Code section 11623 for a preliminary distribution of an "asset of no financial value" but "of immense sentimental value to the widow." The item she sought was a vial of Joseph's frozen sperm. The fertility center would not release it without a court order.

Joseph's parents, as interested parties, objected to the preliminary distribution. They contended it was contrary to Joseph's express wishes, as set forth in the Agreement, that upon his death, his sperm sample was to be discarded. The Agreement comported with their understanding that their son did not wish to father a child posthumously.

██ After an evidentiary hearing, the probate court issued a tentative decision. The court found the following undisputed evidence. Joseph and Iris "loved each other deeply and completely." Joseph was opposed to having children, but agreed to the fertility procedures due to Iris's strong desire for children. The couple's dispute over having children led them to marriage counseling. According to the marriage counselor, Joseph believed Iris would divorce him if he did not agree to have children and a divorce would

devastate him. The Agreement provided the sperm sample was to be discarded upon Joseph's death. This option was selected instead of the option to donate the sperm sample to Iris. Iris completed the Agreement, making the selections. Joseph signed it.

The probate court found the key issue was the intent of the decedent regarding use of his sperm. The court's analysis was based on *Hecht v. Superior Court* (1993) 16 Cal.App.4th 836 [20 Cal.Rptr.2d 275] (*Hecht*), a case involving a dispute over disposition of frozen sperm, and *Davis v. Davis* (Tenn. 1992) 842 S.W.2d 588 (*Davis*), involving a dispute over disposition of frozen preembryos. The court found the Agreement evidenced the intent of both Iris and Joseph that the sperm be discarded upon his death. There was no evidence they ever discussed changing the provisions of the Agreement.

Iris objected to the tentative decision. She questioned the court's analysis of intent. She argued her testimony that Joseph did not even read the Agreement was admissible evidence with probative value. Finally, she asserted Joseph's intent was that she have his child.

The court denied the request for clarification of its analysis. It found Iris failed to prove the Agreement did not express Joseph's intent. By a preponderance of the evidence, the court found Joseph's intent was to stop the fertility process upon his death by discarding his frozen sperm.

The petition for distribution of the sperm sample was denied.

## DISCUSSION

In making its decision, the court below found "little to no guiding precedent," but found some guidance in the *Hecht, supra*, 16 Cal.App.4th 836, and *Davis, supra*, 842 S.W.2d 588, cases. Iris contends the court erred in applying *Hecht*, and argues that its requirement of an "unequivocable" intent provides an unworkable standard. Iris further contends the surviving spouse has a right to procreate that should be considered and the balancing test set forth in *Davis* should be applied. In applying the balancing test, the surviving spouse's interest prevails.

We begin our analysis by discussing the *Hecht* and *Davis* cases. We then conclude the probate court properly determined that the disposition of the frozen sperm is governed by the intent of the deceased donor and that the *Davis* balancing test is inappropriate in these circumstances.

In *Hecht, supra*, 16 Cal.App.4th 836, William Kane deposited 15 vials of his sperm in an account at a sperm bank and then took his own life. The

storage agreement provided that upon Kane's death, the sperm bank was to continue to store the specimens upon request of the executor of Kane's estate or to release the specimens to the executor. Kane's will named his girlfriend, Deborah Hecht, as executor. The will also bequeathed the sperm specimens stored at the sperm bank to Hecht for her to become impregnated, if she wished. (*Id.* at p. 840.) Kane wrote a letter to his children about family memories and why he was committing suicide. It was addressed to his two children from a previous marriage, but included the possibility that he could have posthumous children by Hecht. (*Id.* at p. 841.)

Kane's will was admitted into probate and a special administrator appointed. Kane's children contested the will. (*Hecht, supra*, 16 Cal.App.4th at p. 841.) The parties attempted to settle the dispute, entering into two settlement agreements. The first was a tentative agreement that did not specifically mention the sperm. (*Ibid.*) The second agreement sought to assign the estate's interest in the sperm to Hecht. (*Id.* at p. 842.) In proceedings to settle the estate, the administrator, at the request of the children, petitioned for instructions to order the sperm destroyed on public policy grounds, or for an order of a preliminary distribution of either 100 or 80 percent of the sperm to the children on alternate theories of entitlement. (*Id.* at p. 843.) The probate court ordered the sperm destroyed and Hecht petitioned the appellate court for a writ of mandate or prohibition to vacate the order. (*Id.* at pp. 844–845.)

The appellate court first determined that the frozen sperm fell within the broad definition of property in Probate Code section 62, so the probate court had jurisdiction over it. (*Hecht, supra*, 16 Cal.App.4th at p. 846.) The court began with the acknowledgment that the law on property rights in the human body was unsettled. (*Id.* at p. 847.) It looked to ethical standards in the IVF field. The American Fertility Society took the position that gametes and concepti are the property of the donors and donors had the right to decide their disposition. (*Id.* at p. 848.) The court also found the *Davis, supra*, 842 S.W.2d 588, case informative. Relying on *Davis*, the court concluded the decedent's interest in the frozen sperm vials "occupies 'an interim category that entitles them to special respect because of their potential for human life.' " (*Hecht, supra*, at p. 846.) At the time of his death, Kane "had an interest, in the nature of ownership, to the extent that he had decisionmaking authority as to the use of his sperm for reproduction." (*Id.* at p. 850.)

The *Hecht* court then turned to whether the probate court's order to destroy the sperm could be upheld. It found the decision could not be upheld on the basis of the will or the parties' settlement agreement because neither permitted destruction of all the sperm. (*Hecht, supra*, 16 Cal.App.4th at p. 851.) It found no public policy against insemination of an unmarried woman. (*Id.* at pp. 852–855.) Finally, the court found no public policy against postmortem

artificial insemination. (*Id.* at pp. 855–861.) The court noted it was premature to address the issue of family integrity urged by the children and speculative whether any child conceived by Hecht using Kane's sperm would be a burden to society. (*Id.* at pp. 855, 860.) The appellate court found the order for destruction of the sperm was an abuse of discretion. (*Id.* at p. 861.)

In discussing the public policy concerns of postmortem artificial insemination, the *Hecht* court discussed a French case, *Parpalaix v. CECOS*, as described in Shapiro & Sonnenblick, *The Widow and the Sperm: The Law of Post-Mortem Insemination* (1986) 1 J.L. & Health 229 (Shapiro & Sonnenblick). Alain Parpalaix, a 24 year old suffering from testicular cancer, made a deposit of sperm at CECOS, with no instructions for its future use. At the time, Alain was living with his girlfriend; he married her two days before his death. She then requested the sperm deposit. When CECOS denied the request, the widow, joined by her in-laws, went to court. (Shapiro & Sonnenblick, *supra*, 1 J.L. & Health at pp. 229–230.) Their complaint sounded in contract; they claimed they were owners of the sperm as Alain's natural heirs and CECOS had broken the contract of bailment by refusing to return the sperm. (*Id.* at p. 230.) The widow's attorney also argued she had a moral right to the sperm. (*Id.* at p. 231.) The French court noted the difficulties under French law governing inheritance rights and illegitimacy posed by children born postmortem, but offered no solutions. (*Id.* at pp. 231–232.)

The French court refused to apply contract principles to the case. It also refused to consider the sperm as an indivisible body part; "it described sperm as 'the seed of life . . . tied to the fundamental liberty of a human being to conceive or not to conceive.' " (Shapiro & Sonnenblick, *supra*, 1 J.L. & Health at p. 232, fn. omitted.) The fate of the sperm was to be decided by the person from whom it was drawn; the sole issue was that of intent. (*Ibid.*) "The court had to decide not only whether Alain Parpalaix had intended his widow to be artificially inseminated with his sperm, but also whether that intent was 'unequivocable.' " (*Ibid.*, fn. omitted.) From the testimony of Alain's wife and parents, the French court found Alain intended to make his wife the mother of his child. (*Ibid.*)

Relying on this description of the French case, the *Hecht* court appears to have accepted the rule that the sperm donor's intent controls in disposition of his frozen sperm after his death. (*Hecht, supra,* 16 Cal.App.4th at p. 857.) The *Hecht* court did not have to actually decide that question because, as it made clear repeatedly, it was not deciding the issue of intent or the actual disposition of the frozen sperm; factual issues remained to be resolved. (*Id.* at pp. 851–852, 859 & fn. 9, 861.) For purposes of determining whether the probate court order to destroy the sperm could be upheld, the *Hecht* court

assumed "that decedent intended to allow Hecht to use his sperm for posthumous artificial insemination." (*Id.* at p. 859.)

The *Davis* case arose in a divorce action after the parties agreed on all the terms of dissolution except one. They could not agree on the disposition of seven cryogenically preserved preembryos stored by a fertility clinic that had assisted the Davises with IVF. (*Davis, supra,* 842 S.W.2d 588, 589.) The court found the preembryos were neither persons nor property, but held an intermediate position, entitled to greater respect than property but not accorded the respect of persons. (*Id.* at p. 596.) "We conclude that preembryos are not, strictly speaking, either 'persons' or 'property,' but occupy an interim category that entitles them to special respect because of their potential for human life." (*Id.* at p. 597.) The Davises did not have a true property interest in the preembryos, but "they do have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the preembryos, within the scope of policy set by law." (*Ibid.*)

The *Davis* court held that an agreement regarding disposition of untransferred preembryos in the event of contingencies (such as death or divorce) should be presumed valid and enforceable. (*Davis, supra,* 842 S.W.2d at p. 597.) "This conclusion is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition." (*Ibid.,* fn. omitted.)

The Davises had not made such an agreement, so the court was required to resolve the dispute. "[W]e hold that disputes involving the disposition of preembryos produced by *in vitro* fertilization should be resolved, first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed. Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question." (*Davis, supra,* 842 S.W.2d at p. 604.)

■ We agree with the *Hecht* court that gametic material, with its potential to produce life, is a unique type of property and thus not governed by the general laws relating to gifts or personal property or transfer of personal property upon death.[1] (*Hecht, supra,* 16 Cal.App.4th at p. 850.) We

---

[1] In this regard, we note the gametic material at issue here is distinguishable from the preembryos at issue in *Davis, supra,* 842 S.W.2d 588. It is further removed from potential life because Joseph's sperm could not produce life until joined with an egg. We express no opinion as to the proper resolution of a dispute regarding disposition of preembryos.

also agree that Joseph, as the person who provided the gametic material, had at his death an interest, in the nature of ownership, to the extent he had decisionmaking authority as to the use of the gametic material for reproduction. (*Ibid.*; *Davis, supra*, 842 S.W.2d at p. 597.) Accordingly, in determining the disposition of Joseph's frozen sperm, the trial court properly relied on Joseph's intent as to its use after his death.

Using the intent of the donor to determine the disposition of gametic material upon the donor's death is consistent with California law in this area. Probate Code section 249.5 addresses the property rights of a child of a decedent conceived and born after the death of the decedent. Such a child is deemed to have been born within the decedent's lifetime, if, among other things, it is proved by clear and convincing evidence that the decedent specified in writing "that his or her genetic material shall be used for the posthumous conception of a child." (Prob. Code, § 249.5, subd. (a).) Under the Uniform Anatomical Gift Act (Health & Saf. Code, § 7150 et seq.), a person has the right to make, amend, revoke, or refuse to make a donation of any part of his body to take effect after his death. (Health & Saf. Code, §§ 7150.20–7150.30; see also *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 141 [271 Cal.Rptr. 146, 793 P.2d 479] [suggesting patient may have limited right to control use of excised cells].) This law suggests that when the issue is postmortem reproduction using gametic material from a deceased donor, the decedent's intent as to such use should control.

The probate court found Joseph intended that his frozen sperm be discarded upon his death. Iris faults the court for relying on the Agreement and contract law to find Joseph's intent. Iris cannot attack the court's finding. The record on appeal does not contain a transcript of the hearing. "In a judgment roll appeal every presumption is in favor of the validity of the judgment and any condition of facts consistent with its validity will be presumed to have existed rather than one which will defeat it. [Citation.] The sufficiency of the evidence to support the findings is not open to review. [Citation.]" (*Wheelright v. County of Marin* (1970) 2 Cal.3d 448, 454 [85 Cal.Rptr. 809, 467 P.2d 537].)

Iris contends *Hecht* requires a finding of the decedent's "unequivocable" intent. She argues both that the probate court failed to follow *Hecht* on this point and that the "unequivocable" intent test is unworkable. "Unequivocable" intent is not the test set forth in *Hecht*. Although the term is used by the *Hecht* court in quoting the *Parpalaix* case (*Hecht, supra*, 16 Cal.App.4th at p. 857), it nowhere else in the opinion refers to an unequivocal intent. Rather, the court speaks only of the "decedent's actual intention" or the "decedent's

intent." (*Id.* at pp. 851, 859, fn. 9.) The probate court found by a preponderance of evidence that it was Joseph's intent that his sperm be discarded upon his death. That finding was sufficient.

Iris argues intent is difficult to determine because those undergoing IVF face great emotional and psychological turmoil, circumstances change, and their intent may change over time. (See, e.g., *Roman v. Roman* (Tex.App. 2006) 193 S.W.3d 40 [upholding agreement to discard frozen embryos upon divorce despite woman's desire to use embryo]; *A.Z. v. B.Z.* (2000) 431 Mass. 150 [725 N.E.2d 1051] [declining to enforce agreement to give preembryos to wife upon divorce over husband's objection]; *Kass v. Kass* (1997) 235 A.D.2d 150 [663 N.Y.S.2d 581] [enforcing informed consent agreement to permit IVF program to retain cryopreserved prezygotes for approved research despite woman's change of heart].) Further, those undergoing IVF may not consider the possibility of their premature death. That may be and we can only encourage those undergoing IVF to fully consider all its ramifications and plan for all contingencies. (See Health & Saf. Code, § 1644.7 [form for establishing donor's intent as to use of genetic material for conception after death].) We need not consider what disposition is appropriate where the donor's intent cannot be determined because in this case the court was able to determine Joseph's intent.

Finally, Iris contends the probate court's decision ignores the fundamental right of the donee spouse to procreate. She contends the balancing test of *Davis* should be employed. The *Hecht* court indicated the *Davis* balancing test would be pertinent if the trier of fact determined the decedent's intent was contrary to Hecht's intent to bear his child. (*Hecht, supra*, 16 Cal.App.4th at p. 859, fn. 9.) Iris further contends that since procreative rights are based on the right to privacy, and that right ends at death, in balancing the relative interests, hers prevails.

■ We disagree that the *Davis* balancing test applies in this situation. The *Davis* court noted, "the right of procreational autonomy is composed of two rights of equal significance—the right to procreate and the right to avoid procreation." (*Davis, supra*, 842 S.W.2d at p. 601.) Although the court recognized the impact of the IVF procedure was more severe on women, considering the joys of desired parenthood or the anguish of unwanted parenthood, it found the Davises "must be seen as entirely equivalent gamete-providers." (*Ibid.*) The right of procreative autonomy "dictates that decisional authority rests in the gamete-providers alone, at least to the extent that their decisions have an impact upon their individual reproductive status." (*Id.* at p. 602.)

In this case, there is only one gamete provider. The material at issue is Joseph's sperm, not a preembryo. Only Joseph had "an interest, in the nature

of ownership, to the extent that he had decisionmaking authority as to the use of his sperm for reproduction." (*Hecht, supra*, 16 Cal.App.4th at p. 850.) The disposition of Joseph's frozen sperm does not implicate Iris's right to procreative autonomy. That would be so only if she could show that she could become pregnant only with Joseph's sperm.

## DISPOSITION

The judgment is affirmed.

Raye, Acting P. J., and Robie, J., concurred.