Opinion issued February 9, 2006



     











In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00541-CV




RANDY M. ROMAN, Appellant

V.

AUGUSTA N. ROMAN, Appellee




On Appeal from the 310th District Court
Harris County, Texas
Trial Court Cause No. 2002-62153




O P I N I O N

          In a case of first impression in Texas, appellant, Randy M. Roman, appeals the
judgment of the trial court that awarded three frozen embryos


 to appellee, Augusta
N. Roman, in the couple’s final decree of divorce. In five issues, Randy argues that
the trial court (1) failed to declare the rights of the parties pursuant to a contract; (2)
erred in awarding the three frozen embryos to Augusta; (3) erred in failing to make
findings of fact and conclusions of law concerning constitutional issues; (4) violated
his constitutional rights by awarding the frozen embryos to Augusta; and (5) erred in
awarding frozen embryos to Augusta when Randy had withdrawn his consent. 
          We reverse and remand the cause.
Background
          Augusta and Randy married on July 5, 1997. After a few years of marriage, the
parties began trying to have children. When the traditional avenues of childbirth
proved unsuccessful, the parties tried artificial insemination. Several attempts at
artificial insemination likewise proved unsuccessful.
          In August 2001, the parties met with Dr. Vicki Schnell, the Medical Director
at the Center for Reproductive Medicine (the “Center”). Augusta had laparoscopic
surgery and three more attempts at artificial insemination, but was still unsuccessful
at getting pregnant. 
          Dr. Schnell then recommended that the parties try in vitro fertilization (“IVF”). 
The process of IVF “involves the aspiration of ova or oocytes from the follicles of a
woman’s ovaries and fertilization of these ova in a laboratory procedure using the
husband’s or donor’s sperm. The resulting [embryos] are transferred to the uterus of
the potential mother, whereupon a viable pregnancy may occur. Because the IVF
procedure frequently produces more [embryos] than safely may be transferred at one
time, the extra [embryos] may be frozen for future use through a process called
cryopreservation.” In the Interest of O.G.M., 988 S.W.2d 473, 474 (Tex.
App.—Houston [1st Dist.] 1999, pet. dism’d).
          On March 27, 2002, the parties signed a number of documents at the Center,
including one entitled “Informed Consent for Cryopreservation of Embryos”
(“embryo agreement”). In this document, the parties authorized the storage of the
embryos in a frozen state until the Center determined that appropriate conditions
existed for transfer of the embryos to the woman’s uterus and both husband and wife
agreed to the transfer. In addition, the parties chose to discard the embryos in case
of divorce. The document also contained a provision that allowed the parties to
withdraw their consent to the disposition of the embryos and to discontinue their
participation in the program.
          On April 17, 2002, thirteen eggs were extracted from Augusta. Six of these
eggs were successfully fertilized with Randy’s sperm, resulting in six embryos. Of
the six embryos that were fertilized, only three reached a stage of development to
warrant the cryopreservation process. Dr. Schnell scheduled Augusta’s implantation
for April 20. On the night before the implantation, Randy expressed feelings to
Augusta that led him to withdraw his consent to the implantation scheduled for the
next day. The next day, the parties told Dr. Schnell that Augusta would not undergo
the implantation procedure. A month after they decided to wait, the parties signed an
agreement to unfreeze three embryos and implant them. The agreement was
contingent on the parties’ obtaining approval from a counselor. That agreement never
took effect because Randy and Augusta did not progress through counseling.
          On December 10, 2002, Randy filed for divorce and Augusta filed a
counterclaim for divorce that included claims for fraud and intentional infliction of
emotional distress.


 The parties reached a final binding agreement during mediation
as to the division of the marital property, except for the frozen embryos. At trial,
Randy asked the trial court to uphold their written agreement, which specified that the
embryos be discarded. Augusta wanted the opportunity to have the embryos
implanted so that she could have a biological child.


 If any children were born from
the embryos, Augusta stated that Randy would not have parental rights or
responsibilities. The day after the trial ended, the trial court ordered that Augusta
take possession of the remaining three embryos. After the trial court awarded the
embryos to Augusta, Randy complied with section 160.706(a) of the Texas Family
Code, which allows him to seek parental rights to any child born from the embryos. 
See Tex. Fam. Code Ann. § 160.706(a) (Vernon 2002).
          On March 29, 2004, Randy filed a motion for new trial and a request for
findings of fact and conclusions of law regarding the award of the frozen embryos to
Augusta.


 The trial court signed its first set of findings on April 26, 2004. The trial
court’s pertinent findings of fact provide as follows:
          1.       Three embryos, now frozen, were created during the
marriage using the sperm of Randy Roman and the eggs of
Augusta Roman.
 
          2.       The parties signed a mediation agreement addressing all
issues involving the division of community property except
for the three frozen embryos.
 
          3.       The three frozen embryos are community property.

          The trial court’s conclusions of law state:
          1.       The division of the community property agreed to by
Petitioner and Respondent in their mediation agreement
and the award to Respondent of the three frozen embryos
as set forth in the Modified Final Decree of Divorce is just
and right and a fair and equitable division of the
community property.

On May 13, 2004, the trial court signed a second and more thorough set of findings
submitted by Augusta. The record reflects that Randy never filed a request for
additional findings.


 
          The trial court’s second set of findings of fact state, in relevant part the
following:
          13.     The Court considered all evidence and testimony in
balancing the constitutional rights of both parties in
making the award of the three (3) frozen embryos to
AUGUSTA N. ROMAN. 
 
          14.     The Court considered all evidence and testimony regarding
documents the parties signed with the Center of
Reproductive Medicine . . . .

          The second set of conclusions of law states, 
          7.       The award of three (3) embryos to [Augusta] is part of a
just and right division of the community estate having due
regard for the constitutional rights of each party. 
 
          8.       The order for the Center of Reproductive Medicine to
surrender the three (3) frozen embryos to [Augusta] is
necessary to effect a just and right division of the
community estate.
 
Analysis
          In this case of first impression in Texas, we consider the merits of the trial
court’s award of frozen embryos to Augusta as part of a “just and right” division of
community property in light of the parties’ prior written agreement to discard the
embryos. We answer the issue with which we are presented as narrowly as possible
in anticipation that the issue will ultimately be resolved by the Texas Legislature.


 
          Award of Embryos
          In his second issue on appeal, Randy argues that the trial court erred when it
awarded the three frozen embryos to Augusta because the award violated the parties’
embryo agreement. Randy contends that the agreement clearly provided for disposal
of the frozen embryos in the case of divorce and that the trial court erred by not
enforcing the agreement. Randy points to the following specific provisions in the
embryo agreement:
2. We consent and authorize the embryo(s) to be stored in a
frozen state until Dr. Schnell and the IVF Laboratory determine
that appropriate conditions exist for transfer of the embryo(s) to
the wife’s uterus and both husband and wife agree to the transfer.
 
* * * 
 
10. If we are divorced or either of us files for divorce while any
of our frozen embryos are still in the program, we hereby
authorize and direct, jointly and individually, that one of the
following actions be taken:
 
          The frozen embryo(s) shall be . . . Discarded. 
 
          Randy argues that these provisions of the embryo agreement allow transfer of
the embryos only if both parties agree and that the trial court erred by not enforcing
the agreement and ordering the embryos destroyed.


 Randy also argues that no
evidence or insufficient evidence supports a finding that the embryo agreement was
not enforceable or invalid. Although no Texas case has ruled on whether these types
of agreements are enforceable, Randy contends that other jurisdictions have held that
similar agreements are enforceable. 
          Augusta does not dispute that she signed and initialed the embryo agreement. 
She does dispute, however, the agreement’s validity and the interpretation of the
agreement. Specifically, Augusta argues that the trial court could have chosen not to
enforce the agreement because other state supreme courts have found agreements
similar to the one at issue here invalid. Because this issue has not been decided by
any court in Texas, we will review the scant case law on the issue.
          Prior cases involving frozen embryos
          All but one of the cases surveyed involved an oral or written agreement
regarding disposition of frozen embryos. In Davis v. Davis, the earliest case, the
husband and wife did not have an agreement for the disposition of the embryos. 842
S.W.2d 588, 589 (Tenn. 1992), cert. denied sub nom, Stowe v. Davis, 507 U.S. 911,
113 S. Ct. 1259 (1993). The trial court awarded custody of the frozen embryos to the
wife, but the court of appeals reversed on the ground that the husband had a
constitutional right not to beget a child. Id. at 589. In affirming the judgment of the
court of appeals, the Supreme Court of Tennessee ultimately chose to weigh the
interests of each party and concluded that the husband’s interest in avoiding
parenthood was more significant than the wife’s interest in donating the embryos to
another couple for implantation. Id. at 604. 
          Although the parties did not have an agreement concerning disposition of the
frozen embryos, the court discussed the enforceability of a contract in this situation. 
The court stated, “an agreement regarding disposition of any untransferred
preembryos in the event of contingencies (such as the death of one or more of the
parties, divorce, financial reversals, or abandonment of the program) should be
presumed valid and should be enforced as between the progenitors.” Id. at 597. The
court further stated that, 
[W]e recognize that life is not static, and that human emotions run
particularly high when a married couple is attempting to
overcome infertility problems. It follows that the parties’ initial
‘informed consent’ to IVF procedures will often not be truly
informed because of the near impossibility of anticipating,
emotionally and psychologically, all the turns that events may
take as the IVF process unfolds. Providing that the initial
agreements may later be modified by agreement will, we think,
protect the parties against some of the risks they face in this
regard. But, in the absence of such agreed modification, we
conclude that their prior agreements should be considered
binding.

Id. at 597 (emphasis in original). 
          In Kass v. Kass, prior to implantation, the parties signed a consent form which
stated that the frozen embryos would not be released from storage without the written
consent of both parties. 696 N.E.2d 174, 176 (N.Y. 1998). Another part of the
consent agreement provided that if the parties could not reach a mutual decision on
the frozen embryos, the embryos would be donated to research. Id. at 177. Before
filing suit, the wife decided that she opposed the destruction of the embryos. Id. The
trial court awarded custody of the embryos to the wife and directed her to implant
them within a medically reasonable time. Id. The appellate division reversed. It
unanimously agreed that the consent agreement regarding the disposition of unused
fertilized eggs should control. Id. A two-justice plurality found that the parties’
consent agreement indicated their desire to donate the embryos for research purposes
if they could not both consent to the embryos’ disposition. Id.
          The highest court of New York affirmed the lower court’s holding that the
parties’ consent agreement should control. The court noted that the parties had
expressed their intent that if they could not agree on the embryos’ disposition, they
would be donated for research purposes. Id. at 178. It stated, “[P]arties should be
encouraged in advance, before embarking on IVF and cryopreservation, to think
through possible contingencies and carefully specify their wishes in writing. Explicit
agreements avoid costly litigation in business transactions.” Id. at 180. The court
further stated, 
Advance directives, subject to mutual change of mind that must
be jointly expressed, both minimize misunderstandings and
maximize procreative liberty by reserving to the progenitors the
authority to make what is in the first instance a quintessentially
personal, private decision. Written agreements also provide the
certainty needed for effective operation of IVF programs.

Id.
          A New Jersey appellate court, by contrast, rejected an alleged oral agreement
to procreate as against public policy. See J.B. v. M.B., 751 A. 2d 613, 615 (N.J.
Super. Ct. App. Div. 2000). In J.B. v. M.B., the husband wanted to preserve the
frozen embryos for his use or that of an infertile couple. 751 A. 2d at 615. The wife
wanted the frozen embryos destroyed, and she did not want her former husband to
retain them for his own use or to donate them to anyone else. Id. at 616. The trial
court ruled in favor of the wife, who wanted the embryos destroyed, because the
family unit was no longer intact. Id. 
          The appellate court balanced the wife’s right not to become a parent with the
husband’s right to procreate using the embryos under the Fourteenth Amendment and
concluded that the husband’s right would not be impaired if the embryos were
destroyed because he still would be able to father children. Id. at 618–19. Thus, even
if the Fourteenth Amendment applied, the court rejected the husband’s argument that
his constitutional rights would be violated if the embryos were destroyed. Id. at 619. 
The appellate court further held that a contract to procreate is contrary to New Jersey
public policy and is unenforceable. Id. The court thus affirmed the trial court’s order
that the frozen embryos be destroyed. Id. at 620. 
          The Supreme Court of New Jersey affirmed, but modified the court of appeals’
holding, recognizing “that persuasive reasons exist for enforcing preembryo
disposition agreements.” J.B. v. M.B., 783 A.2d 707, 719 (N.J. 2001). The supreme
court held that the parties’ consent agreement did not “manifest a clear intent by [the
parties] regarding disposition of the preembryos in the event of a dissolution of their
marriage.” Id. at 713 (internal quotations omitted). In reaching its ultimate holding,
the court considered the constitutional rights of the parties and stated that, “[w]e will
not force [the wife] to become a biological parent against her will.” Id. at 717. The
court held that it will “enforce agreements entered into at the time in vitro fertilization
[has] begun, subject to the right of either party to change his or her mind about
disposition up to the point of use or destruction of any stored preembryos.” Id. at
719. If the parties disagree about disposition because one party has reconsidered their
decision, the court stated, “the interests of both parties must be evaluated.”


 Id.
          In A.Z. v. B.Z., before the eggs were retrieved from the wife, the parties signed
consent forms. 725 N.E.2d 1051, 1053–54 (Mass. 2000). The wife filled out the
form, which stated that if they “[s]hould become separated, [they] both agree[d] to
have the embryo(s) . . . return[ed] to [the] wife for implant.” Id. at 1054. The court
noted that the husband always signed a blank consent form. Id. After the husband
signed the consent form, the wife would fill in the disposition and sign the form
herself. Id.
          The trial court permanently enjoined the wife from utilizing the frozen embryos
held in cryopreservation. The supreme judicial court stated that “in view of the
purpose of the form (drafted by and to give assistance to the clinic) and the
circumstances of execution, we are dubious at best that it represents the intent of the
husband and the wife regarding disposition of the preembryos in the case of a dispute
between them.” Id. at 1056. 
          Specifically, the court stated that neither the form nor the record indicated that
the parties intended the form to be a binding agreement. Id. Instead, the court
interpreted the form only to “define the donors’ relationship as a unit with the clinic.” 
Id. In reaching its decision, the court also noted that the consent form did not contain
a duration provision and that it could not assume that the donors intended their
consent form to govern a disposition of frozen preembryos four years after it was
executed. Id. at 1056–57. 
          The court also looked to the donors’ conduct in connection with the execution
of the consent forms and determined that their conduct created doubt that the consent
form represented the intentions of both donors. Id. at 1057. Because the husband
signed a blank form and the wife later filled in her choice regarding disposition of the
frozen embryos, the court concluded that the consent form did not represent the true
intentions of the husband. Id.
          In Litowitz v. Litowitz, the husband and wife contracted with an egg donor and
an IVF clinic. See 48 P.3d 261, 263 (Wash. 2002), cert. denied, 537 U.S. 1191, 123
S. Ct. 1271 (2003). After the husband’s sperm fertilized three of the donor’s eggs,
the eggs were implanted, resulting in the birth of a child. Before the birth, however,
the parties separated, and sued for divorce. At trial, the wife asked to be awarded the
remaining embryos to implant in a surrogate. The trial court awarded the embryos to
the husband, who wanted to donate them to an out-of-state couple. The appeals court,
in reviewing the egg donor contract, noted that it did not provide what would be done
with the embryos if the parties could not agree or if they dissolved their marriage. 
The court concluded that the husband’s right not to procreate compelled an award of
the embryos to him. Id. at 265. The Supreme Court of Washington reversed, holding
the parties to their preembryo cryopreservation contract, which provided that the
remaining embryos would be thawed out, but not allowed to undergo further
development, and that they would be disposed of after they had been maintained in
cryopreservation for five years. Id. at 271.
          The most recent case to consider the issue, In re Marriage of Witten, 672
N.W.2d 768, 771–72 (Iowa 2003), likewise focused on the embryo agreement. In
Witten, the parties signed an embryo storage agreement with the IVF clinic prior to
undergoing the IVF process. Id. at 772. The consent form provided that frozen
embryos would be released only with the approval of both the husband and the wife. 
Id. The trial court concluded that the embryo storage agreement governed the dispute
over the frozen embryos. Id. at 773. The parties were thus enjoined from taking any
actions with the embryos unless both parties consented. Id.
          The Iowa Supreme Court noted that the embryo agreement did not specifically
address what would happen to the embryos upon divorce. Id. The court reviewed the
three approaches that courts have used in resolving these types of disputes


 and
adopted the contemporaneous mutual consent model. Id. at 783. In adopting this
model, the court found that it would be against Iowa public policy “to enforce a prior
agreement between the parties in this highly personal area of reproductive choice
when one of the parties has changed his or her mind concerning the disposition or use
of the embryos.”


 Id. at 781. Nevertheless, the court recognized that an embryo
agreement between embryo donor and fertility clinics “serves an important purpose
. . . ensuring that all parties understand their respective rights and obligations.” Id. 
Given these different considerations, the court stated, “[W]e reject the contractual
approach and hold that agreements entered into at the time in vitro fertilization is
commenced are enforceable and binding on the parties, ‘subject to the right of either
party to change his or her mind about disposition up to the point of use or destruction
of any stored embryo,’” providing that any change of intention is communicated in
writing to all parties. Id. at 782–83 (quoting J.B., 783 A.2d at 719). Because the
agreement did not address disposition of the embryos upon divorce and neither party
could agree on the embryos’ disposition, the court enjoined both parties from utilizing
the embryos without the other’s written consent. Id. at 783. 
          We are mindful of the cases that have addressed this issue and particularly what
we see as an emerging majority view that written embryo agreements between embryo
donors and fertility clinics to which all parties have consented are valid and
enforceable so long as the parties have the opportunity to withdraw their consent to
the terms of the agreement. Because we are not bound by state law from other
jurisdictions, however, we will also review our own statutes to determine the public
policy of this State in the context of embryo agreements. 
          Public Policy of Texas
          Currently, the State of Texas has laws regarding children of assisted
reproduction and gestational agreements, both contained within the Uniform
Parentage Act.


 See Tex. Fam. Code Ann. § 160.701-.707 (Vernon 2002), §§
160.751-.763 (Vernon Supp. 2005). Assisted reproduction means a method of
causing pregnancy other than sexual intercourse, including IVF and transfer of
embryos. Id. § 160.102(2)(D) (Vernon 2002). The statute requires that both husband
and wife consent to assisted reproduction. Id. § 160.704(a). However, section
160.704(b) acknowledges that a child may be born without the husband’s consent. 
Id. § 160.704(b). Section 160.706 addresses paternity in the event of divorce as
follows: “if a marriage is dissolved before the placement of eggs, sperm, or embryos,
the former spouse is not a parent of the resulting child unless the former spouse
consented in a record that if assisted reproduction were to occur after a divorce the
former spouse would be a parent of the child.” Id. § 160.706(a). This section also
provides that consent of the former spouse may be withdrawn at any time before the
placement of eggs, sperm, or embryos. Id. § 160.706(b). Noticeably absent from
these sections is any legislative directive on how to determine the disposition of the
embryos in case of a contingency such as death or divorce. Nor is there anything in
the case law that is incompatible with the recognition of the parties’ agreement as
controlling.
          We also look to new legislation concerning gestational agreements. A
gestational agreement is an agreement between a woman and the intended parents of
a child in which the woman relinquishes all rights as a parent of a child conceived by
means of assisted reproduction and which provides that the intended parents become
the parents of the child. See id. § 160.752(a) (Vernon Supp. 2005). The statute
specifically authorizes a gestational mother, her husband if she is married, each
donor, and each intended parent to enter into a written agreement that relinquishes all
parental rights of the gestational mother and provides that the intended parents
become the parents of the child. See id. § 160.754(a). The statute also requires that
the parties to a gestational agreement must enter into the agreement before the 14th
day preceding the date of transfer of eggs, sperm, or embryos to the gestational
mother. See id. § 160.754(e).


 Parental rights are transferred when a court validates
the gestational agreement. See id. § 160.753(a), (b). To validate a gestational
agreement, the court must find, in relevance to our issue, that each party to the
agreement voluntarily entered into and understood the terms of the agreement. Id. §
160.756(b)(4). The statute also provides that “[b]efore a prospective gestational
mother becomes pregnant by means of assisted reproduction, the prospective
gestational mother, her husband if she is married, or either intended parent may
terminate a gestational agreement. . . .” Id. § 160.759(a).


 
          We glean from these statutes that the public policy of this State would permit
a husband and wife to enter voluntarily into an agreement, before implantation, that
would provide for an embryo’s disposition in the event of a contingency, such as
divorce, death, or changed circumstances. We agree with the New York Court of
Appeals that “[a]dvance directives, subject to mutual change of mind that must be
jointly expressed, both minimize misunderstandings and maximize procreative liberty
by reserving to the progenitors the authority to make what is in the first instance a
quintessentially personal, private decision.” Kass, 696 N.E.2d at 180. These
agreements should thus be “presumed valid and should be enforced as between the
progenitors.” Davis, 842 S.W.2d at 597; Kass, 696 N.E.2d at 180–181. 
          We believe that allowing the parties voluntarily to decide the disposition of
frozen embryos in advance of cryopreservation, subject to mutual change of mind,
jointly expressed, best serves the existing public policy of this State and the interests
of the parties. We hold, therefore, that an embryo agreement that satisfies these
criteria does not violate the public policy of the State of Texas.
          We now determine whether the embryo agreement in this case manifests a
voluntary unchanged mutual intention of the parties regarding disposition of the
embryos upon divorce. 
          Embryo Agreement
          Absent ambiguity, we interpret a contract as a matter of law. DeWitt County
Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999). “Whether a contract is
ambiguous is a question of law that must be decided by examining the contract as a
whole in light of the circumstances present when the contract was entered.” 
Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.
1996). “If the written instrument is so worded that it can be given a certain or definite
legal meaning or interpretation, then it is not ambiguous and the court will construe
the contract as a matter of law.” Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). 
“An ambiguity exists only if the contract language is susceptible to two or more
reasonable interpretations.” Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154,
157 (Tex. 2003). The language in a contract is to be given its plain grammatical
meaning unless doing so would defeat the parties’ intent. DeWitt County Elec. Coop.,
1 S.W.3d at 101. We presume that the parties intended every clause to have an effect. 
Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).
          The following elements are required for the formation of a valid and binding
contract: 1) an offer, 2) acceptance in strict compliance with the terms of the offer,
3) a meeting of the minds, 4) each party’s consent to the terms, and 5) execution and
delivery of the contract with the intent that it be mutual and binding. Wal-Mart
Stores, Inc. v. Lopez, 93 S.W.3d 548, 555–56 (Tex. App.—Houston [14th Dist.] 2002,
no pet.). Consideration is also a fundamental element of every valid contract.


 
Turner-Bass Assocs. of Tyler v. Williamson, 932 S.W.2d 219, 222 (Tex. App.—Tyler
1996, writ denied).
          The evidence shows that the parties came to the Center on March 27, 2002 to
sign a variety of forms. The parties received a cover page along with nine forms.


 
The cover page stated, “Many forms require careful thought regarding decisions you
and your spouse will be asked to make.” We focus our discussion on one of the
documents entitled, “Informed Consent for Cryopreservation of Embryo.”



          On page two, under the sub-heading “Consent for Cryopreservation,” the
document states,
1. We, Augusta Roman (wife) and Randy Roman (husband), the
undersigned, hereby authorize and consent to the freezing of some
or all of the remaining embryos that result from our participating
in the IVF process. 
 
2. We consent and authorize the embryo(s) to be stored in a
frozen state until Dr. Schnell and the IVF Laboratory determine
that appropriate conditions exist for transfer of the embryo(s) to
the wife’s uterus and both husband and wife agree to the transfer. On page three, the document states,
 
7. We understand that legal principles and requirements
regarding IVF and embryo freezing have not been firmly
established. There is presently no state legislation dealing
specifically with these issues. We have been advised that each
embryo resulting from the fertilization of the wife’s oocytes by
the husband’s sperm shall be the joint property of both partners
based on currently accepted principles regarding legal ownership
of human sperm and oocytes. We are aware that these regulations
may change at any time.8. We hereby authorize and require that the actions we have
marked below be taken if either or both of us should die while
any of our frozen embryos are still in possession of the Center of
Reproductive Medicine IVF Program. We consent to the
following: If only one of us survives, the surviving spouse shall
have full authority to decide what is to be done with the
embryo(s). 9. We understand that if both of us die, the frozen embryo(s) will
be discarded.

          On page four, the document states,
10. If we are divorced or either of us files for divorce while any
of our frozen embryos are still in the program, we hereby
authorize and direct, jointly and individually, that one of the
following actions be taken:
 
          The frozen embryo(s) shall be . . . Discarded.


11. If other circumstances arise whereby embryos remain which
are not used for the purpose of attempting to initiate a pregnancy
in the wife or if the husband and wife are not able to agree on
disposition of remaining embryos for any reason, we hereby
authorize and direct that the unused frozen embryo(s) will be
discarded.          On page five, the document states,
16. We agree and acknowledge that we are voluntary
participants, but we understand that we are free to withdraw our
consent as to the disposition of our embryo(s) and to discontinue
participation by requesting relocation of our embryo(s) to another
suitable location at any time without prejudice.20. Our questions regarding these procedures have been
answered to our satisfaction. Our participation is voluntary. We
understand that we may withdraw our consent at any time prior to
the procedure. We have read and understand this form. We have
received a copy of this form.

          Neither party disputes that he or she signed the agreement or initialed the
bottom of each page of this agreement. They also do not dispute that each one of
them specifically initialed section 8 (embryo disposition in the event of a death) and
section 10 (embryo disposition in the event of divorce). They also do not dispute that
their frozen embryos were still in the program or that, when they filed for divorce,
they had not withdrawn consent as to the disposition of the embryos and discontinued
in the participation in the program.
          Rather, Augusta argues that she understood the embryo agreement to apply to
remaining embryos only after implantation had occurred. She testified that she never
agreed to destroy all the embryos without an opportunity to get pregnant. Although
she does not refer specifically to it in her brief, Augusta is apparently relying on the
first section of the embryo agreement, entitled Consent for Cryopreservation. This
section provides, “[The parties] hereby authorize and consent to the freezing of some
or all of the remaining embryos that result from our participation in the IVF process.” 
We disagree with Augusta’s interpretation of the embryo agreement. 
          For this Court to follow Augusta’s interpretation, we would necessarily have
to impute language to the contract that is not present and disregard language that is. 
Specifically, Augusta would have us read the clause as stating that “the parties hereby
authorize and consent to the freezing of some or all of the remaining embryos [after
an initial set of embryos is implanted] that result from our participating in the IVF
process.” In an unambiguous contract, we will not imply language, add to language,
or interpret it other than pursuant to its plain meaning. See Schaefer, 124 S.W.3d at
162; Natural Gas Clearinghouse v. Midgard Energy Co., 113 S.W.3d 400, 407 (Tex.
App.—Amarillo 2003, pet. denied).
          Section 10 of the agreement specifically states, “If we are divorced or either of
us files for divorce while any of our frozen embryos are still in the program, we
hereby authorize and direct, jointly and individually, that one of the following actions
be taken: The frozen embryo(s) shall be . . . Discarded.” (Emphasis added). 
Although the parties could have chosen to release the frozen embryos either to Randy
or Augusta, they chose the option to discard the frozen embryos in the event of
divorce. 
          The embryo agreement’s language could not be clearer. Section 10 specifically
addresses the disposition of the frozen embryos in the event of a divorce. It is
undisputed that Augusta and Randy both signed the entire embryo agreement, and
they both initialed section 10. The evidence shows that the parties considered this
section and did not sign it without thought. 
          Randy testified that before signing the embryo agreement, he and Augusta
discussed their options about what would happen to the embryos upon divorce. 
Randy stated that they were both excited about taking the next step forward, but also
nervous. Randy did not notice that Augusta was too emotionally upset to give
consent. He also testified that they did not disagree as what to do in the event of a
divorce. He further testified that no coercion, threats, bribery, or promises were used
to make them sign the embryo agreement. 
          Dr. Schnell testified that the purpose of the cryopreservation form was to
determine the parties’ desires for the disposition of their embryos upon certain events
such as divorce or death. Dr. Schnell testified that the couple had chosen to have the
embryos discarded in the event that they divorced. On the day the parties signed the
consent forms, Dr. Schnell testified that Augusta “was able to participate in the
consult, and that she was able to understand the questions that I asked her, and she
was able to state that she did initial those and that she understood the consents and
that all her questions were answered concerning the process.” At that time, Dr.
Schnell did not notice any outward signs of an emotional problem that would prevent
Augusta from understanding and making an informed consent. 
          Augusta testified that she would have signed anything to move forward
because her goal was to have a child. She testified that it was possible that because
she was taking birth control pills she was not in the right mental state to understand
the agreement. Augusta further stated that she understood the agreement, “but I
wasn’t focusing on much on the [inaudible] to the outcome of the whole process of
having a child.” She also stated that no one was putting any force, coercion or threats
on either of the parties to sign the agreement. She understood that one of the options
she had been offered was to give the embryos to herself in the event of divorce.           Augusta testified that she signed the agreement with the Center. When asked
whether she and Randy had had a meeting of their minds as to what would happen in
the unlikely event that they ever divorced, Augusta responded, “We didn’t talk about
divorce. I mean, it wasn’t even a remote—it wasn’t a conversation that we had. He
signed and I signed—and I initialed it.” She was also asked, “So you and Randy
Roman never had an agreement on what would happen if you divorce, what would
happen to the embryos if you divorced.” She responded, “No, we didn’t have a
discussion.” Augusta clarified that they did not have an agreement, other than that
expressed in the consent form with the center. 
          “[P]arties strike the deal they choose to strike and, thus, voluntarily bind
themselves in the manner they choose.” Natural Gas, 113 S.W.3d at 407. Although
Augusta’s choice may not have been fully considered, the evidence shows that she
was aware of and understood the significance of her decision. The parties’ embryo
agreement clearly indicates their wishes in the event of divorce. We conclude that the
parties’ embryo agreement was not ambiguous so as to preclude a meeting of the
minds. 
          Our conclusion that section 10 shows a meeting of the minds is bolstered by
section 8 of the embryo agreement, which provides that in the event that one or both
of the parties should die, they agree to give the embryos to the surviving spouse even
though they could have chosen to discard the embryos. The parties’ choice to give
the surviving spouse full authority over the embryos indicates that the parties were
aware of other options in the agreement. The agreement shows that when the parties
wanted to discard the embryos, they made that choice. When the parties wanted to
give the embryos to one party, they made that choice. In fact, the embryo agreement
shows that at some point in signing section 8, Augusta’s initials were on the option
that would have discarded the embryos. Her initials were subsequently crossed out
and re-entered on the choice giving the surviving spouse full authority for the
embryos. 
          We also note that section 11 is applicable to this dispute. Section 11 states,
“[I]f the husband and wife are not able to agree on disposition of remaining embryos
for any reason, we hereby authorize and direct that the unused frozen embryo(s) will
be discarded.” Even without section 10, which clearly provides the course of action
in the event of divorce, section 11 would also inform the trial court of what to do in
the event of a contingency when the parties could not agree.
          Texas statutory law and section 16 of the embryo agreement allow a party to
withdraw consent to assisted reproduction procedures. See Tex. Fam. Code Ann. §
160.706(b) (Vernon 2002) (stating that consent may be withdrawn at any time before
the placement of eggs, sperm, or embryos). Neither Randy nor Augusta withdrew
consent to the provision in the embryo agreement that the frozen embryos were to be
discarded in the event of divorce. Nor did they withdraw consent to the provision
within section 11 of the embryo agreement—that if the parties could not agree on the
disposition of the embryos, the frozen embryos were to be discarded. Rather, their
embryos were still in the program, and the embryo agreement was still in effect when
the parties divorced.



          Augusta also argues that Randy “breached the intent and purpose of the IVF
agreements, thereby invalidating any decisions made by Mrs. Roman based upon her
belief that the entire agreement would be honored.” (Emphasis in original.) Augusta
does not cite any argument or authority for this proposition. Therefore, we will not
consider it on appeal. See Tex. R. App. P. 38.1(h). 
          Augusta also argues that the embryo agreement did not reflect a meeting of the
minds and was not a valid agreement concerning the disposition of the embryos. She
reasons that because Randy deceived her as to his true state of mind, there could be
no meeting of the minds. Although there was evidence that Randy had been upset
with Augusta in the two years prior to the scheduled implantation, we cannot see how
this precludes a meeting of the minds in regard to their mutual decision for the
disposition of their embryos in the event of a divorce. See CU Lloyd’s of Texas v.
Hatfield, 126 S.W.3d 679, 682 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)
(“If a written contract is so worded that it can be given a definite or certain legal
meaning, then it is unambiguous, and [we] may not consider parol evidence as to the
parties’ intent.”). Randy’s deceit may have been relevant for proving fraud, but the
trial court found against Augusta on that issue.
          Augusta additionally argues that because the Center agreed to do whatever the
Court ordered it to do, the Center’s actions supersede the Center’s cryopreservation
document and render it moot. Augusta does not state why the embryo agreement is
rendered moot, nor does she cite any authority for the proposition. We decline to
address her argument. See Tex. R. App. P. 38.1(h).
          We hold that the embryo agreement provides that the frozen embryos are to be
discarded in the event of divorce. By awarding the frozen embryos to Augusta, the
trial court improperly rewrote the parties’ agreement instead of enforcing what the
parties had voluntarily decided in the event of divorce. Accordingly, the trial court
abused its discretion in not enforcing the embryo agreement. 
          We sustain Randy’s second issue.



          Because Randy’s second issue is dispositive, we decline to address Randy’s
remaining issues. See Tex. R. App. P. 47.1.
Conclusion
          We reverse the judgment and remand the cause to the trial court to enter an
order consistent with this opinion and with the parties’ agreement that the frozen
embryos be discarded. All pending motions are denied.






                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Hanks.