Filed 5/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SARAH ROBERTSON,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PEYMAN SAADAT et al.,<br><br>    Defendants and Respondents. | B292448<br><br>(Los Angeles County<br>Super. Ct. No. BC621038) |

APPEAL from a judgment of the Superior Court of Los Angeles, Barbara Ann Meiers, Judge. Affirmed.

John L. Dodd & Associates, John L. Dodd, Benjamin Ekenes; Vorzimer Masserman and Dean Masserman for Plaintiff and Appellant.

Manning & Kass Ellrod, Ramirez, Trester, Louis W. Pappas and Steven J. Renick for Defendants and Respondents Peyman Saadat, M.D. and Peyman Saadat, M.D., Inc. dba Reproductive Fertility Center.

Kjar, McKenna & Stockalper and Patrick E. Stockalper for Defendant and Respondent In Vitrotech Labs, Inc.

_____

Plaintiff Sarah Robertson (plaintiff) appeals from the judgment after the trial court sustained demurrers to her causes of action alleged against defendants and respondents Peyman Saadat (Saadat), Peyman Saadat M.D., Inc. dba Reproductive Fertility Center (Reproductive Fertility Center), and In Vitrotech Labs, Inc. (In Vitrotech Labs) (collectively, defendants). We refer to the latter two defendants as the corporate defendants.

Plaintiff alleged that her husband entered an irreversible coma due to a rare genetic disorder. Shortly before his death, plaintiff arranged to extract his sperm in hopes of one day conceiving a child with it. Plaintiff stored the sperm in a tissue bank that ultimately came under the control of defendants. Ten years later, when plaintiff requested the sperm, defendants disclosed that they could not locate it. Plaintiff brought suit, asserting contract and tort claims based on the loss of her ability to have a child biologically related to her deceased husband.

The trial court sustained demurrers to the tort causes of action, concluding, inter alia, that plaintiff was not legally entitled to use her husband's sperm for posthumous conception, and therefore suffered no injury from its loss. The trial court similarly ruled plaintiff could not recover damages for emotional distress or loss of fertility interests under her breach of contract cause of action.

We agree with the trial court. Under California law, the donor's intent controls the disposition of his or her gametic material upon death. The only allegations regarding plaintiff's husband's intent were that plaintiff, at the time she requested

2

her husband's sperm be extracted, represented to his physicians that she and her husband had always wanted to have children together, and provided letters and cards written by her husband similarly indicating a desire to have children with his wife. Although those allegations, if true, would establish that the husband wished to have children with his wife while he was alive, they fail as a matter of law to establish that the husband intended his wife to conceive a child with his sperm posthumously.

Accordingly, we affirm.

## FACTUAL BACKGROUND

We summarize the relevant allegations from the second amended complaint (SAC),[1] the focus of plaintiff's challenges on appeal.

Plaintiff married Aaron Robertson (Aaron)[2] in 1995. Aaron had Marfan Syndrome, a potentially life-threatening genetic disease that has a 50 percent chance of being passed to offspring. Plaintiff and Aaron "planned to start a family when reliable medical technology existed" to prevent Aaron from transmitting his genetic disease to their children.

On May 26, 2004, Aaron suffered a stroke as a result of the Marfan Syndrome and fell into a coma. Two days later, Aaron's medical team at UCLA Medical Center told plaintiff that Aaron's

_____

[1] The SAC, as filed, was erroneously labeled as the "Third Amended Complaint." The trial court ordered the caption corrected.

[2] Because plaintiff and Aaron share a last name, we refer to Aaron by his first name to avoid confusion. No disrespect is intended.

3

"condition was terminal and there was no chance of him recovering."

Plaintiff represented to Aaron's treating physicians that she and Aaron "always desired to have children together," and requested that the hospital extract Aaron's sperm so plaintiff could "one day fulfill their longtime dream of [plaintiff] having [Aaron's] children." Based on "letters or cards that had been written by Aaron prior to his stroke wherein he expressed his desire to have children with his wife," and plaintiff's status as Aaron's "conservator and legal next of kin," UCLA Medical Center's risk management department determined the letters or cards "were sufficient to be considered documents of gift" and that plaintiff "could give consent to harvest [Aaron's] sperm." A UCLA ethics panel also approved of plaintiff's request. UCLA Medical Center personnel then extracted Aaron's sperm. Aaron's parents paid for the procedure.

The extracted sperm was stored in six vials at Tyler Medical Clinic. Plaintiff informed Tyler Medical Clinic's laboratory director, Dr. Jerry Hall (Hall), that she intended to use Aaron's sperm to conceive a child "once she could confidently ensure" Marfan Syndrome would not be passed on to the child. Hall confirmed the sperm was "viable" and "in excellent condition."

Aaron died on June 1, 2004 at the age of 29. Following Aaron's death, plaintiff signed a written agreement in which Tyler Medical Clinic agreed to freeze and store Aaron's sperm.

In November 2005, defendant Saadat joined Tyler Medical Clinic as clinical director. In February 2006, plaintiff noticed her annual storage invoice was from a different entity than Tyler Medical Clinic. She contacted Dr. Jaroslav Marik (Marik) of

4

Tyler Medical Clinic by e-mail, stating her intention someday to conceive a child with Aaron's sperm and asking for Marik's reassurance that the specimens would be safe.

Marik responded that he was retiring, and that the specimens would be safely transferred to Saadat, who was purchasing the business. Marik told plaintiff Aaron's sperm would be safe and would be moved to the upper floor of the same office building it was in at that time, with Hall remaining in control of the tissue bank. Based on Marik's representations, and Tyler Medical Clinic's website's description of Saadat's experience, articles, and awards, plaintiff allowed the sperm to be transferred to Saadat and began making payments to him.

In the summer of 2006, Saadat formally purchased Tyler Medical Clinic and transferred the contents of its tissue bank to his own facility. Plaintiff began receiving annual invoices from defendant Reproductive Fertility Center, and later defendant In Vitrotech Labs, both entities owned and controlled by Saadat. Plaintiff timely made all storage fee payments.

In April 2014, plaintiff asked defendants to transfer the six vials of sperm to UCLA so she could begin her fertility treatment.[3] In November 2014, Saadat's clinic manager, Ilinca Halfon (Halfon), informed plaintiff defendants could account for only one of the six vials, and had no explanation for what happened to the other five. Plaintiff, alarmed, began making arrangements to transfer the one remaining vial to another "more competent facility," and demanded that

---

[3] The SAC does not always specify which defendant took a particular action or received a particular communication from plaintiff. The lack of specificity does not impede our resolution of this appeal.

defendants perform an audit and inventory to locate the five missing vials.

In March 2015, Saadat told plaintiff that the missing vials likely were lost in a fire that occurred before he had purchased Tyler Medical Clinic. Plaintiff later learned the fire had occurred more than a year before Tyler Medical Clinic took possession of Aaron's sperm.

Plaintiff requested that defendants transfer the remaining vial to UCLA Medical Center. Saadat then "made repeated and unsolicited efforts to coerce and intimidate Plaintiff to allow him" to perform the fertility treatments instead.

Plaintiff refused Saadat's entreaties and insisted defendants transfer the remaining vial to UCLA Medical Center. On April 27, 2015, Halfon informed plaintiff by e-mail that the remaining vial in fact belonged to another individual with the same first name as her deceased husband. "In other words, Defendants claimed they had no remaining sperm and tissue from" Aaron.

Plaintiff alleged, purportedly on information and belief, that defendants knew they did not have Aaron's vials at the time they offered her fertility treatments, and instead intended to impregnate her with sperm from another donor. Plaintiff further alleged on information and belief that defendants used Aaron's sperm to impregnate other patients of defendants without those patients' knowledge or consent, thus potentially passing on Marfan Syndrome. Plaintiff requested that defendants notify all patients treated since 2006 of the possibility they may have undergone fertility treatment using Aaron's sperm, but defendants refused.

# PROCEDURAL HISTORY

Plaintiff and Aaron's parents filed an action against defendants on May 26, 2016. The first amended complaint asserted causes of action for professional negligence; breach of contract; intentional and negligent infliction of emotional distress; negligence; fraud, misrepresentation, and/or concealment; loss of consortium; conversion; breach of fiduciary duty; conspiracy; and violations of federal regulations and the California Commercial and Business and Professions Codes. Defendants filed demurrers and motions to strike in response.

The trial court on its own motion raised the question whether plaintiff and Aaron's parents had standing to assert their claims. The trial court tentatively concluded that none of the plaintiffs had a legal right to extract Aaron's sperm or to store and use it after his death, and therefore could not have been "adversely affected by its loss." The trial court further tentatively concluded the relief sought was "contrary to public policy" in that it was based on an "intrusion" into Aaron's right to procreation and to govern his own body.

After receiving further briefing from the parties, the trial court denied its own motion without prejudice. The trial court concluded the parties had not addressed sufficiently whether defendants were estopped under bailment law from asserting as a defense the plaintiffs' lack of legal interest in the sperm, an issue plaintiffs' counsel had "obliquely raised" during oral argument.

The trial court ruled on defendants' demurrers and motions to strike, among other things sustaining the demurrer to the cause of action for intentional infliction of emotional distress and dismissing Aaron's parents as plaintiffs for lack of standing. The

7

trial court's other rulings regarding the first amended complaint are not relevant to the issues on appeal and we do not summarize them.

Plaintiff then filed the SAC, asserting eight causes of action for professional negligence; breach of oral and written contract; negligent infliction of emotional distress; negligence; fraud, misrepresentation, and/or concealment; and violations of Commercial Code section 7403 and Business and Professions Code sections 17200 and 17500. The cause of action for professional negligence was asserted against Saadat only. The other causes of action were asserted against all defendants.

Under the cause of action for professional negligence, plaintiff claimed defendants had "denied her property and the opportunity to have a child biologically related to her deceased Husband," and she was "suffering from severe emotional stress and depression" stemming from "the knowledge that she will never fulfill her deceased Husband's wishes to have children." Under both the professional negligence and breach of contract causes of action, plaintiff alleged economic damages "including but not limited to the expense of fertility treatments that would otherwise not have been incurred and significant legal costs and fees."

Under the cause of action for negligent infliction of emotional distress, plaintiff alleged she "suffers daily with the knowledge that not only was Plaintiff denied her property and the opportunity to have a child biologically related to her deceased Husband, but that there is a distinct possibility that an unknown number of patients of Defendants are unknowingly raising [Aaron's] children who may be at serious risk of a deadly disease."

8

Under the negligence cause of action, plaintiff alleged defendants had a "special relationship" with plaintiff "as the custodian[s] and overseer[s] of [plaintiff's] biological property." Plaintiff claimed she had been harmed but did not specify damages for this cause of action.

Under the fraud, misrepresentation, and/or concealment cause of action, plaintiff alleged defendants represented through their website, advertising, and promotional materials that they had the ability to store sperm and other tissue safely, despite knowing from past experience that they did not. Plaintiff alleged defendants made the misrepresentations "to induce Plaintiff to continue to use their cryopreservation facilities over the period of nine years, which generates enormous revenue for Defendants." Plaintiff alleged she entrusted Aaron's sperm to defendants in reliance on those representations. Plaintiff alleged defendants further lied to her to cover up their misconduct once she discovered the vials were missing. Plaintiff sought punitive damages.[4]

Defendants again filed demurrers and a motion to strike. The trial court sustained the demurrers to all causes of action except breach of contract, which the trial court allowed to go forward against the corporate defendants only.

Most pertinent to this appeal, the trial court ruled that plaintiff "failed to provide any facts supportive of any damage claim, other than that, inferentially, she may have a right to

_____

[4] The trial court sustained demurrers to the three causes of action for violations of the Commercial and Business and Professions Codes, and plaintiff does not challenge those rulings in this appeal. We therefore do not summarize the allegations under those causes of action.

9

recover what was paid in storage fees—with an amount necessary to be pled sufficient to establish jurisdiction in a general jurisdiction court." As for plaintiff's allegations that she was "denied the right and opportunity to inseminate with her late husband's sperm," the trial court found "no dispute on the facts of this case that while living [Aaron] did not consent to the withdrawal of his sperm or to its use for insemination after his death." Thus, plaintiff "had no right to use this sperm for reproductive purposes in all events."

The trial court stated that "no court should make a ruling which would support or encourage a plaintiff to seek to recover based upon his or her inability to utilize[ ] illegally obtained organs or tissue (i.e., tissue taken without the donor's consent or otherwise specifically permitted by law)." The trial court stated that such a ruling would be "in violation of public policy."

The trial court also concluded that plaintiff had failed to state a claim for professional negligence when the agreement between plaintiff and defendants was for storage only, without any defendant acting in the role of a health care provider.

The trial court granted the motion to strike all allegations other than those pertinent to the breach of contract cause of action. The trial court noted particularly that the SAC's allegations on information and belief concerning defendants' purportedly impregnating other women with Aaron's sperm had no bearing on plaintiff's damages, nor did plaintiff have standing to assert claims on behalf of those women. The trial court also found plaintiff had failed to plead adequate facts supporting the allegations on information and belief.

Finally, the trial court stated that it "incorporates by reference all arguments made in the demurring papers and

10

Motion to Strike . . . and sustains these demurrers and grants the Motion to Strike on all grounds stated therein."

The trial court granted plaintiff leave to amend, "but only to clean up the Complaint . . . to state a cause of action for breach of contract by the corporate defendants only plus facts supportive of any damages claimed to have foreseeably resulted from that breach."

Plaintiff filed a petition for a writ of mandate challenging the trial court's order sustaining the demurrers and granting the motion to strike. This court summarily denied the petition, with one justice dissenting.

Plaintiff then filed a third amended complaint asserting a single cause of action for breach of oral and written contracts. Following further motion practice not relevant to this appeal, plaintiff filed a fourth amended complaint, also asserting a cause of action for breach of contract, and adding as additional defendants Dr. Marik, his medical corporation, and Tyler Medical Clinic.[5]

Saadat remained a defendant under the theory that the corporate defendants allegedly were his alter egos. In describing the relationship of Saadat and the corporate defendants, the fourth amended complaint alleged those defendants "conspired amongst themselves to misappropriate Plaintiff's stored tissue and sperm and used Aaron Robertson's genetic material to create

---

[5] Plaintiff added Marik and his related entities to the fourth amended complaint as a result of the trial court consolidating a separate action plaintiff filed against those defendants with the action against Saadat and the corporate defendants. Marik and his related entities are not parties to this appeal.

embryos and seek to achieve pregnancies for other unsuspecting patients of Defendants."

The allegations in the fourth amended complaint were essentially a stripped-down version of the allegations in the SAC: Plaintiff contracted with Tyler Medical Clinic to store Aaron's sperm after Aaron died, Saadat sought to purchase Tyler Medical Clinic, Marik assured plaintiff the sperm would be safe when transferred to Saadat, plaintiff paid annual storage fees to defendants, and, when plaintiff requested the sperm, defendants informed her they could not locate the vials. Plaintiff claimed damages "including but not limited to the expense of fertility treatments that would otherwise not have been incurred and significant legal costs."

Defendants again filed demurrers and motions to strike. The trial court sustained the demurrers and granted the motions to strike, allowing plaintiff the opportunity to file "one last amended Complaint specifying the damages sought as being the loss of the bailment fees and costs (and attorney fees if a part of the bailment contract) and any other specific damages directly from the alleged breach of contract, not to include anything like tort damages, emotional distress, loss of fertility interests, etc. Any attempt to resurrect or re-state or include the types of damages initially sought in this case generally in the nature of consequential damages and/or loss will result in a final dismissal of the Complaint."

Plaintiff's counsel informed the trial court plaintiff had chosen not to file a fifth amended complaint. The trial court dismissed the case with prejudice and entered judgment in favor of defendants. Plaintiff timely appealed.

12

## STANDARD OF REVIEW

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) " ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " ' " (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010.) We "adopt[ ] a liberal construction of the pleading and draw[ ] all reasonable inferences in favor of the asserted claims." (*Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1143.) We are not bound by the trial court's reasoning and may affirm the judgment if correct on any theory. (*Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1192–1193.)

## DISCUSSION

Plaintiff's briefing on appeal largely focuses on the trial court's sustaining the demurrers to the tort causes of action in the SAC on the basis that plaintiff obtained her husband's sperm illegally and in contravention of public policy. Plaintiff argues that "the Legislature has chosen not to prohibit hospitals from harvesting a deceased or incapacitated man's sperm at the request of his spouse," and therefore plaintiff's actions were "neither 'illegal' nor contrary to public policy."

To resolve this appeal, we need not decide whether the extraction of Aaron's sperm was illegal or against public policy, and we decline to do so. Instead, we look to whether the SAC adequately pleaded facts supporting tort damages. We conclude it did not.

Plaintiff's tort causes of action are all premised on the loss of her ability to conceive with her deceased husband's sperm. It is that irreplaceable loss, plaintiff contends, that elevates this case beyond a simple breach of contract action.

The flaw in this premise is that the SAC fails to allege facts establishing that plaintiff was legally entitled to use Aaron's sperm to conceive a child after he died. As we will explain, under California law, the donor's intent governs disposition of stored gametic material at the time of the donor's death. The facts alleged in the SAC are insufficient to show that Aaron, who did not consent to the extraction of his sperm, intended that sperm to be used for posthumous conception. Absent an entitlement to use Aaron's sperm to conceive a child, plaintiff's tort causes of action necessarily fail.[6]

Given our conclusion, we need not and do not decide whether plaintiff was entitled to extract and store Aaron's sperm in the first place, nor do we decide whether plaintiff had any interest in or entitlement to the sperm for purposes other than posthumous conception.[7]

We begin with a discussion of the two cases addressing postmortem disposition of stored sperm: *Hecht v. Superior Court*

---

[6] As noted above, the trial court queried whether defendants, as bailees, were estopped from challenging plaintiff's rights concerning the sperm. Plaintiff does not raise that issue on appeal, and we therefore express no opinion whether any such impediment exists.

[7] Furthermore, nothing in this opinion should be read to affect the respective rights of tissue banks and those who donate gametic material for the tissue banks' use.

14

(1993) 16 Cal.App.4th 836 (*Hecht*), and *Estate of Kievernagel* (2008) 166 Cal.App.4th 1024 (*Kievernagel*).

## A. *Hecht*

In *Hecht*, William Kane (Kane) deposited 15 vials of his sperm at a sperm bank. (*Hecht*, *supra*, 16 Cal.App.4th at p. 840.) He signed a storage agreement granting control over the sperm to the executor of his estate should he die, and authorizing release of the sperm to Deborah Hecht (Hecht), the woman with whom he had been living for five years. (*Ibid.*) Kane drafted a will naming Hecht as his executor, bequeathing the sperm to her for her " 'use,' " and explaining what should happen to his " 'diplomas and framed mementoes' " should Hecht " 'become impregnated with my sperm, before or after my death.' " (*Ibid.*) Kane also drafted a letter stating his wish that Hecht " 'have a child by me after my death.' " (*Id.* at p. 841.) The letter was addressed both to his existing children and his " 'posthumous offspring.' " (*Ibid.*)

Shortly after storing the sperm and drafting these documents, Kane committed suicide. (*Hecht*, *supra*, 16 Cal.App.4th at p. 840.) The probate court, in response to a request from Kane's existing children, ordered the sperm destroyed. (*Id.* at pp. 844–845.) Hecht petitioned for a writ of mandate seeking to vacate that order. (*Id.* at p. 845.) Kane's children opposed the petition as real parties in interest. (*Id.* at p. 839.)

The Court of Appeal granted the petition and issued the writ of mandate prohibiting destruction of the sperm. (*Hecht*, *supra*, 16 Cal.App.4th at p. 861.)

The court first concluded that the sperm "is properly part of decedent's estate" subject to the jurisdiction of the probate court because decedent had an ownership interest in the sperm "to the

15

extent that he had decisionmaking authority as to the use of his sperm for reproduction." (*Hecht, supra*, 16 Cal.App.4th at p. 850.) The Court of Appeal relied on a Tennessee Supreme Court case, *Davis v. Davis* (Tenn. 1992) 842 S.W.2d 588 (*Davis*), which concerned the disposition of cryogenically preserved preembryos[8] in a divorce proceeding. (*Davis*, at p. 589; *Hecht, supra*, 16 Cal.App.4th at pp. 849–850.)

The court in *Davis* quoted an ethics opinion from The American Fertility Society, which stated " 'decision-making authority regarding preembryos should reside with the persons who have provided the gametes' " because " '[a] person's liberty to procreate or to avoid procreation is directly involved in most decisions involving preembryos.' " (*Davis, supra*, 842 S.W.2d at p. 597.) The *Davis* court concluded that the divorcing couple did not have a "true property interest" in the preembryos, which, given their "potential for human life," could not be deemed property. (*Ibid.*) However, in line with the quoted ethics opinion, the couple "d[id] have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the preembryos." (*Ibid.*)

The *Hecht* court similarly concluded "that at the time of his death, decedent had an interest, in the nature of ownership, to the extent that he had decisionmaking authority as to the use of his sperm for reproduction. Such interest is sufficient to constitute 'property' within the meaning of Probate Code section 62. Accordingly, the probate court had jurisdiction with respect to the vials of sperm." (*Hecht, supra*, 16 Cal.App.4th at

---

   [8] The "preembryos" were fertilized eggs that had developed to the four- to eight-cell stage. (*Davis, supra*, 842 S.W.2d at pp. 592, 594.)

16

p. 850.)  The Court of Appeal emphasized, however, that "sperm as reproductive material" was "a unique type of 'property' " not subject to "the general law relating to gifts of personal property or the statutory provisions for gifts in view of impending death." (*Ibid.*)

The Court of Appeal then examined the possible theories underlying the trial court's order to destroy the sperm, holding none was valid.  The court concluded the trial court's order could not have been based on the will, which evidenced Kane's intent that Hecht would use the stored sperm to conceive his child posthumously.  (*Hecht, supra*, 16 Cal.App.4th at pp. 850–851.)  Nor did two settlement agreements between Hecht and Kane's children contemplate destroying the sperm; indeed, Hecht argued that at least one of the agreements required distribution of the sperm to her.  (*Id.* at pp. 842–843, 851.)

Finally, the court rejected the argument that it was contrary to public policy for Hecht to conceive Kane's child after his death.  Specifically, the court held the real parties in interest failed to establish that the public policy of California prohibited either the artificial insemination of an unmarried woman or posthumous conception.  (*Hecht, supra*, 16 Cal.App.4th at pp. 855, 858–861.)

As to posthumous conception, the court stated "real parties do not cite any authority establishing the propriety of this court, or any court, to make the value judgment as to whether it is better for such a potential child not to be born, assuming that both gamete providers wish to conceive the child.  In other words, assuming that both Hecht and decedent desired to conceive a child using decedent's sperm, real parties fail to establish a state interest sufficient to justify interference with that

17

decision. . . . [W]e are aware of no statutes in California which contain a 'statement of public policy which reveals an interest that could justify infringing on gamete-providers' decisional authority . . . .' " (*Hecht*, *supra*, 16 Cal.App.4th at p. 858.)

In reaching its holding, the *Hecht* court made clear the limits of what it was deciding. It expressed no opinion as to the validity or enforceability of Kane's will or the storage agreement, noting only that the record did not indicate the probate court made any such determination in ordering the sperm destroyed. (*Hecht*, *supra*, 16 Cal.App.4th at pp. 850–851.) The *Hecht* court also assumed, but did not decide, that Kane intended for Hecht to use the sperm to conceive a child posthumously. (*Id.* at p. 851.) Similarly, the court eschewed deciding whether the sperm should be distributed to Hecht.[9] (*Hecht*, at p. 852.)

## B.   *Kievernagel*

*Kievernagel* relied on *Hecht* to conclude that "in determining the disposition of gametic material, to which no other party has contributed and thus another party's right to procreational autonomy is not implicated, the intent of the donor must control." (*Kievernagel*, *supra*, 166 Cal.App.4th at p. 1025.) Thus, a widow did not have the right to use her deceased husband's stored sperm to conceive a child when this was

---

[9] "[T]he issues of decedent's actual intention and the right of any party to actual distribution or possession of the sperm are not before us and must await the resolution of other issues in this case. For these same reasons, we must deny that part of Hecht's petition which seeks a writ directing the superior court to distribute the sperm to her. Such a writ is premature because many issues remain unadjudicated." (*Hecht*, *supra*, 16 Cal.App.4th at pp. 851–852.)

18

contrary to the husband's intent, as evidenced by a signed storage agreement providing that the sperm be discarded upon his death.[10]  (*Kievernagel*, at pp. 1025, 1030–1031.)

The Court of Appeal "agree[d] with the *Hecht* court that gametic material, with its potential to produce life, is a unique type of property and thus not governed by the general laws relating to gifts or personal property or transfer of personal property upon death." (*Kievernagel, supra,* 166 Cal.App.4th at p. 1030.)  The court also agreed that the deceased husband, "as the person who provided the gametic material, had at his death an interest, in the nature of ownership, to the extent he had decisionmaking authority as to the use of the gametic material for reproduction." (*Id.* at pp. 1030–1031.)  Thus, it was proper to "[use] the intent of the donor to determine the disposition of gametic material upon the donor's death." (*Id.* at p. 1031.)

The court concluded its holding was consistent with statutory law.  It noted that Probate Code section 249.5 permits a child conceived and born following the death of a decedent to be "deemed to have been born within the decedent's lifetime, if, among other things, it is proved by clear and convincing evidence that the decedent specified in writing 'that his or her genetic material shall be used for the posthumous conception of a child.' " (*Kievernagel, supra,* 166 Cal.App.4th at p. 1031.)  The court also referred to a person's right under the Uniform Anatomical Gift Act "to make, amend, revoke, or refuse to make a donation of any part of his body to take effect after his death." (*Kievernagel,*

---

[10]  In *Kievernagel,* the decedent's parents, as interested parties, objected to the widow's using the sperm for posthumous conception, thus bringing the issue before the probate court. (*Kievernagel, supra,* 166 Cal.App.4th at p. 1026.)

at p. 1031, citing Health & Saf. Code, §§ 7150.20–7150.30.)  The court stated, "This law suggests that when the issue is postmortem reproduction using gametic material from a deceased donor, the decedent's intent as to such use should control." (*Kievernagel*, at p. 1031.)

The court rejected the widow's arguments that denying her the use of the sperm infringed upon "the fundamental right of the donee spouse to procreate" or that the court should apply a balancing test from the *Davis* preembryo case to decide whose interests should prevail.[11]  (*Kievernagel*, *supra*, 166 Cal.App.4th at p. 1032.)  The court quoted *Davis*:  " '[T]he right of procreational autonomy is composed of two rights of equal significance—the right to procreate and the right to avoid procreation.' "  (*Kievernagel*, at p. 1032, quoting *Davis*, *supra*, 842 S.W.2d at p. 601.)  "The right of procreative autonomy

---

[11] The balancing test from *Davis* provides that "disputes involving the disposition of preembryos produced by *in vitro* fertilization should be resolved, first, by looking to the preferences of the progenitors.  If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out.  If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed.  Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question.  If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered.  However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail." (*Davis*, *supra*, 842 S.W.2d at p. 604.)

20

'dictates that decisional authority rests in the gamete-providers alone, at least to the extent that their decisions have an impact upon their individual reproductive status.' " (*Kievernagel*, at p. 1032, quoting *Davis*, at p. 602.)

The court noted that "[t]he material at issue is [the deceased husband's] sperm, not a preembryo," and thus, unlike in *Davis*, "there is only one gamete provider." (*Kievernagel*, *supra*, 166 Cal.App.4th at p. 1032.) "Only [the deceased husband] had 'an interest, in the nature of ownership, to the extent that he had decisionmaking authority as to the use of his sperm for reproduction.' [Citation.] The disposition of [the deceased husband's] frozen sperm does not implicate [the widow's] right to procreative autonomy." (*Id.* at pp. 1032–1033.)

## C. Plaintiff was not legally entitled to use Aaron's sperm for posthumous conception

Plaintiff appears to raise three arguments as to why she is entitled to conceive with her deceased husband's sperm: (1) she is Aaron's spouse; (2) Aaron left no instructions to the contrary; and (3) plaintiff has alleged sufficiently that it was Aaron's intent that she conceive with his sperm posthumously. For the reasons discussed below, we reject each of these arguments.

### 1. *Plaintiff's status as Aaron's spouse did not entitle her to conceive with his sperm*

*Hecht* and *Kievernagel* establish two principles that undercut plaintiff's contention that, as Aaron's spouse, she is entitled to conceive with his sperm. First, sperm, as gametic material, is "a unique type of property and thus not governed by the general laws relating to gifts or personal property or transfer of personal property upon death." (*Kievernagel*, *supra*,

21

166 Cal.App.4th at p. 1030; see *Hecht*, *supra*, 16 Cal.App.4th at p. 850.) Thus, plaintiff has no entitlement to Aaron's sperm based on, for example, intestacy law or testamentary documents not specifically providing for disposition of the gametic material. In other words, the fact that plaintiff as Aaron's spouse may be his legal next of kin has no bearing on whether she may use his sperm for posthumous conception.

Second, the donor's intent controls the disposition of gametic material upon the donor's death. (*Kievernagel*, *supra*, 116 Cal.App.4th at p. 1031.) A spouse, not having provided the gametes at issue, has no " 'interest, in the nature of ownership,' " nor any " 'decisionmaking authority as to the use of [the gametes] for reproduction.' " (*Id.* at pp. 1032–1033.)

Plaintiff, like the widow in *Kievernagel*, invokes the *Davis* balancing test and argues that test favors her. We agree with *Kievernagel* that the *Davis* test has no application when only one spouse donated the gametes at issue. (*Kievernagel*, *supra*, 166 Cal.App.4th at p. 1032.) Such is the case here.[12]

Plaintiff contends that, under the Uniform Anatomical Gift Act (UAGA) (Health & Saf. Code, § 7150 et seq.), as a spouse she had the right to make an anatomical gift of Aaron's tissue "for the purpose of transplantation, therapy, research, or education." (*Id.*, § 7150.40, subd. (a)(2).) Plaintiff argues "[a]lthough the UAGA does not specify conception as one of the purposes [for which a spouse may make an anatomical gift], conception reasonably falls under 'transplantation.' "

---

[12] We express no opinion regarding the donors' respective rights if the gametic material at issue was the product of two donors, such as a preembryo.

22

We reject this argument. Assuming arguendo the UAGA applies to a person who is in an irreversible coma but is not yet deceased, plaintiff identifies nothing in the language or the legislative history of the UAGA suggesting the Legislature intended that act to cover the extraction of gametes for posthumous conception. Indeed, plaintiff appears to concede this in her reply brief, stating, "[T]he UAGA does not directly apply to postmortem sperm extraction for the purpose of conception," and "conception does not fit very well into any of the categories covered under the scope of the UAGA."

We agree with plaintiff's apparent concession. The legislative history of the bill enacting the most recent version of the UAGA indicates that the act's purpose is to "alleviate the critical organ shortage by providing additional ways for making organ, eye, and tissue donations." (Assem. Com. on Health, Rep. on Assem. Bill No. 1689 (2007–2008 Reg. Sess.) as amended Apr. 11, 2007, p. 2 (Rep. on Assem. Bill No. 1689).) The report defines "[o]rgan and tissue donation" as "the process of recovering organs and tissues from a deceased person and transplanting them into others in order to save or enhance the lives of those in need." (*Ibid.*) The report explains that a single donor can save eight lives through organ donation, and improve 50 more lives through tissue donation. (*Ibid.*) The report describes common uses for transplanted tissue: Skin may be used to dress burns and serious abrasions, bone may be used to facilitate healing and prevent amputation in orthopedic surgery, heart valves may replace defective valves, tendons may repair torn ligaments, veins may be used in cardiac bypass surgery, and corneas can restore sight. (*Ibid.*)

23

This legislative history indicates that "transplantation" under the UAGA refers to taking organs and tissue from a donor and placing them in recipients whose equivalent organs or tissue are damaged or otherwise lacking, thus "sav[ing] or enhanc[ing] the lives of those in need." (Rep. on Assem. Bill No. 1689, *supra*, at p. 2.) Implanting a decedent's gametic material in a spouse, not for the purpose of replacing damaged tissue, but to conceive a child, does not constitute "transplantation" for purposes of the UAGA. The UAGA therefore did not authorize plaintiff to use Aaron's sperm for posthumous conception. We express no opinion as to whether the UAGA permits extraction and transplantation of gametic material in other circumstances.

### 2. *Absent an affirmative showing that Aaron intended to allow plaintiff to conceive with his sperm, plaintiff was not entitled to do so*

Because plaintiff cannot rely on her status as Aaron's spouse to claim entitlement to use his sperm for posthumous conception, she must instead establish that it was Aaron's intent that she do so. In *Hecht* and *Kievernagel*, the courts were able to determine the donor's intent from written documents specifically addressing disposition of the sperm upon the donor's death. In contrast, Aaron provided no instructions, written or otherwise, regarding his gametic material.

To the extent plaintiff suggests that, given the absence of express instructions to the contrary, she was entitled to use Aaron's sperm to conceive a child after he died, we reject that contention. It would be unreasonable to presume that Aaron, and the vast majority of persons who have not left instructions for the disposition of their gametic material upon death, thereby intended to cede their procreational autonomy to their spouses or

24

next of kin. The more reasonable presumption, and the one we adopt here, is that absent some affirmative indication to the contrary, a decedent did not intend his or her gametic material to be used for posthumous conception.

This conclusion is consistent with Probate Code section 249.5, cited in *Kievernagel*, which governs the "rights to property to be distributed upon the death of a decedent" to "a child of the decedent conceived and born after the death of the decedent." (Prob. Code, § 249.5; see *Kievernagel*, *supra*, 116 Cal.App.4th at p. 1031.) Under Probate Code section 249.5, a child conceived and born posthumously "shall be deemed to have been born in the lifetime of the decedent, and after the execution of all of the decedent's testamentary instruments" only if, among other things, "[t]he decedent, in writing, specifies that his or her genetic material shall be used for the posthumous conception of a child of the decedent." (Prob. Code, § 249.5, subd. (a); *Kievernagel*, at p. 1031.)

In other words, California law does not recognize a child conceived and born posthumously as the decedent's child for testamentary purposes absent express indication, in writing, of an intent to allow the use of the decedent's genetic material for posthumous conception. In the absence of such a writing, the Probate Code presumes the decedent did not intend the child to receive anything from the decedent's estate.

We recognize Probate Code section 249.5 governs the right of a child conceived posthumously to receive property from the decedent's estate, not the right of a person to conceive the child in the first place. We need not, and do not, decide whether a spouse wishing to conceive with a decedent's gametic material must first show the decedent complied with the specific requirements of

25

Probate Code section 249.5. That statutory section, however, is consistent with our conclusion that a donor's intent to allow the use of his or her gametic material for posthumous conception may not be presumed from the donor's silence, but must be affirmatively shown.

Plaintiff cites *Vernoff v. Astrue* (9th Cir. 2009) 568 F.3d 1102 (*Vernoff*), for the proposition that she was entitled to extract Aaron's sperm to conceive a child. *Vernoff* relied in part on California law to hold that a child conceived and born after the death of her biological father was not entitled to Social Security child survivor benefits. (*Id.* at p. 1104.) Plaintiff argues that in *Vernoff*, "no issue was raised concerning whether harvesting the husband's sperm without his consent was illegal; all implicitly agreed the act of harvesting the sperm without the husband's consent was lawful."

"Cases are not authority, of course, for issues not raised and resolved." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 943.) As plaintiff concedes, *Vernoff* does not address whether the sperm harvesting was lawful, and therefore provides no authority on that point. *Vernoff* does not "implicitly" suggest that California law allows posthumous conception without the decedent's consent. Indeed, the Ninth Circuit concluded that, given the lack of evidence that the decedent had consented to the posthumous conception, under California law he could not be deemed the child's "natural parent" for purposes of entitling her to federal survivor benefits. (*Vernoff, supra,* 568 F.3d at pp. 1107-1110.)

### 3. *The SAC fails to allege that it was Aaron's intent that his sperm be used for posthumous conception*

We look to the SAC to determine whether it alleges facts establishing that Aaron intended that his gametic material be used for posthumous conception. The only allegations regarding Aaron's intent were plaintiff's representation to Aaron's physicians that Aaron "always desired to have children" with her, and "letters or cards that had been written by Aaron prior to his stroke wherein he expressed his desire to have children with his wife." Plaintiff argues these allegations are sufficient to survive demurrer, and the issue of Aaron's intent "is one of fact for a jury."[13]

We disagree; her allegations of intent are insufficient as a matter of law. Aaron did not consent to the extraction of his sperm, and there are no allegations that he and plaintiff discussed posthumous conception, or that he contemplated that possibility at all.[14] There is therefore no reason to think his statements that he wished to have children with plaintiff are anything more than the commonly expressed sentiment among married couples that someday they would like to conceive and raise children together. Those statements, without more, are

---

[13] Plaintiff makes these arguments in the context of whether Aaron consented to the extraction of his sperm, but they apply equally to the question of whether he intended his sperm to be used for posthumous conception.

[14] In noting that these allegations are absent from the SAC, we do not intend to suggest that, had they been made, they would have been sufficient to establish an intent to permit posthumous conception. On that question we express no opinion.

27

insufficient as a matter of law to allege that Aaron contemplated, much less sanctioned, using his sperm for posthumous conception.[15]

The SAC therefore fails to allege facts establishing that plaintiff was entitled to use Aaron's stored sperm for conception. Plaintiff has not requested leave to amend the SAC to add further allegations establishing Aaron's intent, nor has she identified any additional allegations she might add. (*Churchman v. Bay Area Rapid Transit Dist.* (2019) 39 Cal.App.5th 246, 252 [it is plaintiff's burden to show how amendment can cure defects in complaint].)

Plaintiff cites *Matter of Zhu* (N.Y.Sup.Ct. 2019) 64 Misc.3d 280 (*Zhu*), a ruling by a New York trial court allowing the parents of a West Point cadet to extract his sperm after he was declared brain dead following a ski accident. (*Id.* at p. 281.) The court "place[d] no restrictions on the use to which [the] parents may ultimately put their son's sperm, including its potential use for procreative purposes."[16] (*Id.* at p. 288.) The New York court determined the parents' wishes were consistent with the cadet's "presumed intent" based on the cadet's signing of an organ and

_____

[15] To the extent UCLA Medical Center's risk management department and ethics panel allegedly concluded otherwise, we are not bound by those determinations.

[16] The *Zhu* court cautioned: "That is not to say, however, that petitioners may not need to surmount certain obstacles, or confront important residual issues should they choose to seek to use [their son's] sperm for reproductive purposes. A specific use, once chosen, may run afoul, or at least merit consideration, of certain legal, practical and ethical concerns, including the potential reluctance of medical professionals to assist in such a procedure." (*Zhu, supra*, 64 Misc.3d at p. 288.)

tissue donor card, and evidence that the cadet had expressed both a desire to have children and a sense of responsibility to "carry on his cultural and family legacy." (*Id.* at pp. 284–285.) The court also relied on New York's intestacy and anatomical gift statutes to conclude the parents were the individuals the cadet "would have intended to make decisions with respect to the preservation and disposition of the procreative fluids at issue." (*Id.* at pp. 287–288.)

We of course are not bound by rulings of trial courts or courts of other jurisdictions. (*Bolanos v. Superior Court* (2008) 169 Cal.App.4th 744, 761 ["a written trial court ruling has no precedential value"]; *Gentis v. Safeguard Business Systems, Inc.* (1998) 60 Cal.App.4th 1294, 1306 ["California courts are not bound by decisions in other jurisdictions"].)

*Zhu* also is not persuasive. As we have discussed, neither California's intestacy law nor the UAGA applies to a spouse's use of gametic material for posthumous conception, so to the extent the analogous laws in New York provided a statutory basis for the decision in *Zhu*, that basis is lacking here. Further, we respectfully disagree that the signing of an organ donor card and expressions of a desire to have children and carry on the family legacy are sufficient to indicate an intention to allow one's gametic material to be used for posthumous conception.

**D. Absent an entitlement to use Aaron's sperm for posthumous conception, plaintiff fails to state any cognizable tort damages**

Having concluded that plaintiff was not entitled to conceive a child with Aaron's sperm, we now discuss the impact of that determination on the SAC's tort causes of action. On appeal, plaintiff does not challenge the trial court's ruling sustaining the

29

demurrers to her three causes of action for violations of the Commercial and Business and Professions Codes. We thus limit our discussion to the causes of action for professional negligence; negligent infliction of emotional distress; negligence; and fraud, misrepresentation, and/or concealment.

The SAC claimed tort damages under two general theories: First, that defendants deprived plaintiff of the opportunity to conceive a child with her deceased husband's sperm, and second, that defendants impregnated other patients with the sperm without their knowledge or consent. The trial court struck the allegations underlying the second theory, which were pleaded on information and belief, finding that plaintiff had failed to allege sufficient facts supporting her belief. The trial court also concluded that plaintiff lacked standing to assert claims on behalf of other patients, and that defendants' purported misconduct regarding other patients had no bearing on plaintiff's damages.

On appeal, plaintiff argues she properly could make allegations on information and belief when the matters alleged were exclusively within defendants' knowledge. Plaintiff makes no argument, however, against the trial court's alternative bases that plaintiff lacked standing to assert claims on behalf of other patients and that defendants' alleged misconduct towards other patients had no bearing on her damages. Indeed, plaintiff does not make any arguments at all on appeal regarding the allegations concerning the other patients. We thus consider forfeited any challenge to the trial court's ruling striking the allegations concerning other patients, and express no opinion on the merits of that ruling. (*Safeway Wage & Hour Cases* (2019)

30

43 Cal.App.5th 665, 687, fn. 9 [argument forfeited if not raised in opening brief].)

Plaintiff's arguments on appeal instead focus on her entitlement to tort damages based on the loss of the opportunity to conceive a child with Aaron's sperm. This theory underlies all her tort causes of action. The SAC so stated in the first cause of action for professional negligence, alleging defendants had "denied her property and the opportunity to have a child biologically related to her deceased Husband." That allegation was incorporated by reference in the other causes of action as well. Plaintiff also claimed economic damages for "the expense of fertility treatments that would otherwise not have been incurred" and claimed emotional distress damages because she "suffers daily with the knowledge that . . . Plaintiff [was] denied her property and the opportunity to have a child biologically related to her deceased Husband." Apart from the stricken allegations concerning defendants' other patients, the SAC alleged no other specific grounds for tort damages other than the economic and emotional consequences of plaintiff not being able to conceive a child with Aaron's sperm.

Similarly, on appeal plaintiff asserts no basis for tort damages other than the loss of the opportunity to conceive with Aaron's sperm. Her damages argument is based on rulings and opinions from other jurisdictions permitting tort causes of action when loss of stored gametic material denied plaintiffs the opportunity to conceive a child. (See *Jeter v. Mayo Clinic Arizona* (Ariz.Ct.App. 2005) 121 P.3d 1256, 1260, 1272–1273 [married couple stated cause of action for negligence when clinic lost their preembryos, thus requiring plaintiffs to undergo additional procedures to conceive children]; *Witt v. Yale-New Haven Hosp.*

31

(Conn.Super.Ct. 2008) 977 A.2d 779, 788, 794 [plaintiffs stated claims for negligent and intentional infliction of emotional distress when fertility center's loss of ovarian tissue "destroy[ed] any hope they had of potentially conceiving a child together"]; *Del Zio v. Presbyterian Hosp. in New York* (S.D.N.Y. Nov. 9, 1978, No. 74 Civ. 3588 (CES)), 1978 U.S. Dist. LEXIS 14450, at pp. *2–*4, *12–*14 [sufficient evidence of intentional infliction of emotional distress when defendants destroyed culture prepared for in vitro fertilization that was plaintiff's last opportunity to become pregnant].)

As set forth above, plaintiff was not legally entitled to use Aaron's sperm to conceive a child, even if defendants had not lost the sperm. Thus, her position that defendants deprived her of that opportunity is without merit, and the cases she cites are inapposite. Plaintiff on appeal identifies no other basis for tort damages apart from the loss of the opportunity to conceive. She therefore has failed to allege cognizable tort damages.

Plaintiff argues that defendants have failed to provide any support for the proposition that she cannot recover emotional distress damages absent a legal entitlement to use the sperm for posthumous conception. Plaintiff misconstrues the burden on appeal, which requires her, not defendants, to show error. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [appealed judgment presumed correct, and appellant has burden to overcome that presumption].)

Plaintiff argues that the question of her entitlement to use the sperm is not at issue in this case: "At issue here is not an attempt to use the sperm but, rather, to recover damages for lost sperm against a storage facility. [Plaintiff] is not seeking to compel a doctor to perform a medical procedure so that she is

32

able to have a child with Aaron. Whatever potential defenses a doctor might have concerning [plaintiff's] right to possess and make use of Aaron's sperm, those defenses are not available to these particular respondents *here*."

Plaintiff acknowledges in the above quoted argument that she is seeking to recover damages for the lost sperm. As plaintiff states in her brief, however, "Sperm has no value if it cannot actually be used." Thus, the question of whether plaintiff is legally entitled to use the sperm is directly relevant to whether defendants caused her any damages. Plaintiff has failed to allege facts establishing that she legally could use the sperm to conceive a child. Defendants thus could not cause her harm by depriving her of an opportunity she did not have.[17]

E. **Plaintiff cannot recover emotional distress damages on her breach of contract cause of action**

Plaintiff challenges the trial court's ruling sustaining demurrers and motions to strike against the fourth amended complaint on the basis that it continued to allege "tort damages, emotional distress, loss of fertility interests, etc." Plaintiff argues "[a] plaintiff may recover emotional distress damages resulting from a defendant's breach of a contract when the defendant has reason to know that, by the nature of the subject matter of the contract, a breach would result in mental suffering by the plaintiff." Plaintiff does not otherwise challenge the trial court's rulings concerning the fourth amended complaint.

---

[17] Because we conclude the SAC failed to plead cognizable tort damages, we decline to address the trial court's other bases for sustaining the demurrers.

Plaintiff cites *Windeler v. Scheers Jewelers* (1970) 8 Cal.App.3d 844 (*Windeler*), which stated, " 'Whenever the terms of a contract relate to matters which concern directly the comfort, happiness, or personal welfare of one of the parties, or the subject matter of which is such as directly to affect or move the affection, self-esteem, or tender feelings of that party, he may recover damages for physical suffering or illness proximately caused by its breach.' [Citation.]  In its application this rule permits recovery of damages for mental suffering." (*Id.* at p. 851.)

In *Windeler*, the court held the plaintiff could recover damages for emotional distress when a jeweler breached a bailment contract by losing plaintiff's rings.  (*Windeler*, *supra*, 8 Cal.App.3d at p. 852.)  This was because "at the time the bailment was created, plaintiff made known to defendant that the rings were cherished mementos of her husband and were old family rings which, because of their sentimental value, she wished to have made into an heirloom for her daughter.  This was a special circumstance known to both of the parties at the time the contract was entered into." (*Ibid.*)  Thus, the plaintiff could recover for personal injury "proximately resulting from such loss, in addition to the damages sustained because of the actual loss." (*Ibid.*)

Plaintiff also cites *Allen v. Jones* (1980) 104 Cal.App.3d 207 (*Allen*), which stated that mental distress damages may be awarded for breach of "certain contracts which so affect the vital concerns of the individual that severe mental distress is a foreseeable result of breach." (*Id.* at p. 211.)  In that case, the plaintiff could recover against a mortuary that lost the cremated remains of his brother:  "Public policy requires that mortuaries

adhere to a high standard of care in view of the psychological devastation likely to result from any mistake which upsets the expectations of the decedent's bereaved family. As mental distress is a highly foreseeable result of such conduct and in most cases the only form of damage likely to ensue, recovery for mental distress is a useful and necessary means to maintain the standards of the profession and is the only way in which the victims may be compensated for the wrongs they have suffered." (*Id.* at p. 214.)[18]

Plaintiff argues that "[a]ny reasonable storage facility preserving a widow's deceased husband's sperm would understand the widow would have hopes of having a future child using her husband's sperm. Therefore, any reasonable storage facility in that position would foresee that, if the facility were to lose the sperm, the widow suffering that lost hope to have that connection with her deceased husband would suffer severe mental distress."

Plaintiff's argument again is premised on her position that defendants' alleged misconduct destroyed her opportunity to have a child biologically related to her husband. Her argument fails for the same reason her arguments in favor of her tort causes of action in the SAC fail—plaintiff was not legally entitled to conceive a child posthumously with Aaron's sperm in the first place. Again, plaintiff fails to explain how she is entitled to damages for emotional distress based on the loss of an

---

[18] In *Allen*, the plaintiff "pleaded an action in tort as well as in contract," and thus the court did not have to decide "whether mental distress damages alone can ever support an action for breach of contract." (*Allen, supra,* 104 Cal.App.3d at p. 213.)

35

opportunity she never had.  In contrast, *Windeler* and *Allen* involved the loss of items to which the plaintiffs in those cases were indisputably entitled.  The trial court did not err in disallowing plaintiff from recovering emotional distress damages on her breach of contract cause of action.

## DISPOSITION

The judgment is affirmed.  Defendants are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.